SALYERS *v.* SMITH.

Opinion delivered March 3, 1900.

1. AGREEMENT TO SUPPORT—BREACH.—A cause of action on an agreement by defendant to support plaintiff during his life will not arise until *c* fendant either refused to render plaintiff the support promised, or did some act tantamount to such a refusal. (Page 530.)

2. SAME—DAMAGES.—In a suit by the grantor in a deed to recover from the grantee an amount sufficient for his support, which the grantee had agreed to furnish in consideration of the conveyance, the measure of damages would be the amount required for such support during the time only that the grantor had been forced to support himself up to the bringing of the suit. (Page 530.)

3. STATUTE OF FRAUDS—TRUST.—An express trust in land cannot rest in parol, under Sand. & H. Dig., § 3480. (Page 530.)

4. DEED—FAILURE OF CONSIDERATION—REMEDY.—Where the consideration of a deed was the grantee's undertaking to support the grantor, and the grantee failed to comply with such undertaking, the grantor's remedy was either to sue at law for the amount of the consideration as it should become due, or else to treat the contract as void, and sue in equity to cancel it. (Page 530.)

5. VENDOR'S LIEN—WHEN DOES NOT ARISE.—An equitable vendor's lien will not arise to secure the performance of an act the non-performance of which would make a claim for unliquidated damages. (Page 531.)

Appeal from Hempstead Circuit Court in Chancery.

C. A. BRIDEWELL, Special Judge.

STATEMENT BY THE COURT.

The appellee brought this suit in equity against his daughter and her husband, alleging that before her marriage appellee had made her a deed to certain land in consideration that she would support him as long as he lived, and that she afterwards married, and turned him out. He alleged that it would take $150 per annum for his support, and prayed that he have a lien against said land for his support during life, and that the defendants be restrained from selling or incumbering the land; that he have judgment against the land for

the amount necessary, payable each year during his natural life, and, if same be not paid at the time due, that said land be sold to satisfy said lien, and for all proper relief.

The answer denied the consideration alleged, set up a valuable consideration of $600, and denied that appellants had refused to support appellee, and averred that he had left the house without cause, and refused to accept their support, which they offered in their answer to continue.

The deed is a simple, unconditional warranty deed, reciting a consideration of $600, and a receipt for same.

The plaintiff, Smith, himself testified as follows: "When my wife died, I told my daughter Amanda that I would give her all I had when I died if she would remain with me until I died. I made a will giving her all my property. She became dissatisfied with the will, and I gave her my note for $600, and afterwards I made her a deed to the land in controversy; she agreeing to support me the balance of my life. A year or so afterwards she married, and then she and her husband began to abuse and mistreat me; and finally, their conduct becoming intolerable, I was forced to leave them. He [Salyers] would walk through the house, and say that he intended to rule and boss me. I was blind, and they would not assist me or lead me about. I would not have made Amanda a deed to the land except that she would promise that she would never leave or forsake me. My daughter never married until last January. She always stayed at home, and did all the work after my wife died. She did everything she could for me up to the time I left them in last March. The first note I gave her ran out of date, and I gave her another note. I gave the note to Amanda because the other children had married, and were living to themselves, and Amanda was living with and taking care of me, and I intended that she should have all my property at my death, and so I intend now."

J. C. Ross, a son-in-law of plaintiff, testified: That defendant Amanda Salyers had lived with plaintiff for some years before this falling out. That when the plaintiff left defendants' home in March, he went over to try and settle up the dispute, but Salyers told him he would not speak to the old

man, and that it would be better for him to be in the poor house. Plaintiff then went to my house, and remained about two months. It is worth $20 per month to care for the old man."

Mrs. Margaret Ross, a daughter, testified that she had a conversation with defendant Amanda Salyers, in which Amanda told her that she and her husband were going off and leave the old man, and that she did not care whether he was killed or not when she left him, as it would make no difference. Ellen Cottingham, a daughter of the plaintiff, and Willie Ross and a daughter of Mrs. Ross, both the last named grand-children of the plaintiff, testified to the same facts as did Mrs. Ross.

Salyers testified, denying, specifically, the testimony of Ross as to the conversation alleged to have been had with him by Ross; and he further testified that he had never mistreated or abused the plaintiff, but that the plaintiff was cross and irritable. He testified further: "I have never refused him a home. I have always considered my home his, and would take him and care for him now, if he saw proper to come back, and we have never intended to do anything else."

Amanda Saylers, the defendant, testified: "I am 53 years of age. I have never been married except to my present husband. I have always lived with my father until he left my house last March. He has been palsied since my mother's death. After my mother's death May 13, 1889, my father gave me his note for $600. After this note ran out of date, he gave me another note for it. On December 5, 1895, he took up said note, and made me a deed to the property in controversy. I have waited on and cared for my father for thirteen years. For a long time the old man has been in his dotage, and is irritable, and cross and fretful. He frequently would get into a tantrum, and lose his temper without any provocation. At the time he went away he did so without any cause, and I begged him to stay. My husband did all he could to assist him in every way." The witness denies the conversations testified to by Mrs. Ross, Ellen Cottingham and the Ross children. "I feel the same for him now that I have always felt, and would be glad to have him come and live with me."

J. M. Hendricks testified as follows: "I am well acquainted with the parties to this suit. I live on an adjoining farm, and have lived there for the last twenty-seven years, and I know Mrs. Salyers has lived there and taken care of her father ever since the death of her mother. Two hundred dollars is every cent the home farm is worth. The eighty acres in the bottom is worth about $1 per acre. The day Mr. Smith left, I heard some one hallooing, and went over there. It was about sun-down when I walked up. Mr. Smith was sitting out in the yard, and Mrs. Salyers walked away crying. I asked them what was the matter, and they said that they did not know; that they had seen him in a tantrum, but they had never seen him in such a fix before. She went and took him by the hand, and led him about ten feet of the door, and he said he was not going in there. He said he was going to halloo, and she told him not to do that; that Mr. Hendricks was there, and he said, "Who? Jim Hendricks?" and she said, "Yes," and he replied, "I God! Jim, come here." I went to him, and he held out his hand. We had not been on friendly terms for fifteen years. Salyers and his wife said, "Get him in the house, and on the bed, if you can; you may get him quiet." He said, "No," he would not go in there; that, if he did, they would cut his throat, for he had $35. He said he wanted to hire me to take him to Mr. Daniel, and I did so. He gave me as his reason for going away that Mr. Salyers was a perfect devil, and would kill him. He never complained of any mistreatment of either of them. He bragged on Salyers' children, saying that they were the best children he had ever seen. It appeared to me that they were doing everything they could to quiet and pacify him. Neither one of the parties ordered or directed Mr. Smith to leave the place in my hearing."

The chancellor adjudged that appellants should pay appellee $10 per month for his support, declared this a lien, and ordered the land sold in default of its payment.

*W. S. & F. L. McCain,* for appellants.

There can be no resulting trust in this case, as that comes about only when the deed is made without consideration. 1

34

Perry, Trusts, 124. Nor can there be an express trust, as it could not rest in parol. Sand. & H. Dig., § 3480. While no contract will be implied between a father and his child to pay for services, yet it is competent for them to make an express contract with regard thereto. 17 Am. & Eng. Enc. Law, 336. A vendor's lien for an unliquidated amount is not enforceable. 37 Ark. 353.

WOOD, J., (after stating the facts.) The proof is hardly sufficient to justify a finding by the chancellor that appellants had refused to support the appellee, if such support were a part of the consideration, or the only consideration, for the deed. Until appellants had positively refused to render him the support promised, or had done some act tantamount to that, conceding that such was the consideration for the deed, there could be no cause of action to appellee. If the conduct of appellants was such to make the life of appellee intolerable, and to force him to quit their home, still, in a suit brought to recover an amount sufficient for such support, the measure of the damages would be the amount required for such support during the time only that the appellee had been forced to support himself up to the bringing of the suit. Judgment could not be rendered for future support, for that had not accrued, and was not due under the contract, if same should be construed as a continuing contract. Especially would there be no cause of action as to that when the defendants (as here) alleged and proved that they were willing to and would continue such support, if the appellee would only permit. This would have been a complete fulfillment of their contract, and the consideration had not, then, failed.

But, whatever view may be taken of the nature of the consideration, the deed was an executed contract. There were no provisions in it creating a trust, and an express trust of lands can not rest in parol. Sand. & H. Dig., § 3480.

The chancellor clearly erred in rendering a money judgment for a fixed and continuing amount, and declaring same a lien on the lands. No vendor's lien was reserved in the deed. No fraud was charged in the execution of the deed. It expressed a valuable consideration, and was, at least, based upon

a good consideration.   But if the consideration failed, then the remedy was either to sue at law for the amount of the consideration as it should become due, or else to treat the contract as void, and sue in equity to cancel and set it aside.   We cannot find, upon the pleadings and proof, any authority upon which the decree of the chancellor can be upheld.   The court seems to have proceeded upon the theory that the appellee had a vendor's lien for the amount required for his support; we assume, upon the idea that the promised support was in the nature of purchase money.   This was not the correct view. No liquidated amount was stated, if we go beyond the consideration named in the deed.   There was no contract by appellees "to pay any sum of money whatever, nor the equivalent of any definite sum in property or services."   Necessarily, the value of the services was variable, depending upon the varying wants and necessities of the poor old blind man, who had already passed his four score and ten.   A vendor's lien would not arise to secure the performance of an act the non-performance of which would make a claim for unliquidated damages. *Harris* v. *Hanie*, 37 Ark. 348.

The decree of the Hempstead chancery court is therefore reversed, and the complaint is dismissed for want of equity.