MORRIS *v.* NOWLIN LUMBER COMPANY.

Opinion delivered April 17, 1911.

APPEAL AND ERROR—AFFIRMANCE BY DIVIDED COURT.—Where a majority of the court favor the affirmance of a cause, though they differ as to the grounds upon which the affirmance should be based, the cause will be affirmed.

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*Rose, Hemingway, Cantrell & Loughborough,* for appellant Morris; *Ratcliffe, Fletcher & Ratcliffe,* for appellant bonding company.

1. Appellant Morris acquired the funds with which he purchased the land on which the orphanage was built, and the funds with which it was built, as trust funds, in accordance with the discipline and canons of the Catholic Church. In equity, the property belongs to the Catholic Church, notwithstanding the fee is at law in the bishop. Any attempt to divert it from the uses and purposes of the Church would be corrected or restrained by a court of equity. The bishop's title is not different from that of other trustees. 2 L. R. A. 753; Perry on Trusts ¶ 321; Tiedeman, Real Prop. § 440; 1 Pomeroy, Eq. Jur. § § 151-154; 13 Wall. 679; 79 Ark. 555; 3 Pomeroy, Eq. Jur. § § 1018-1025. When property is conveyed to a church, not incorporated, the title vests in the head of the church in succession. Here the Catholic Church is unincorporated, and incapable of holding title. By its discipline, canons and usages, the bishop of the diocese is vested with title to the church property in fee.

The grant to Bishop Morris of the fee in this case vests in him nothing more than would be implied if the grant had been direct to the Church. Thompson on Corporations § 8; 74 Ark. 545; 81 Ark. 236; 9 Cranch 292; *Id.* 327; 6 Cyc. 938; 1 Perry on Trusts § § 248, 249 *et seq.*

2. An orphanage is a public charity, and not subject to liens. 79 Ark. 550; 81 Ark. 235; 86 Ark. 213; art. 16 § 5, Const. Ark. 1874; Kirby's Dig. § 6887; 42 Ark. 536; 38 Am. Rep. 298; 43 L. R. A. 498. The objection that appellant having title to the property in fee, as an individual, may change it to any other use as he may choose, and that therefore it is a private charity, is answered by this court in the Fordyce case, 79 Ark. 550, at p. 567. See also 25 O. St. 245; 43 L. R. A. 498; 60 Fed. 368; 86 Pa. 306.

As to dedication, written proof thereof may be found in appellant's amended complaint, as also in the contract with McLennan to build the orphanage. 98 Ill. 496; 1 Perry

on Trusts § § 82, 84, 85; Warvelle on Real Prop. § § 399, 400, 401. If the proof is not sufficient to establish an express trust on the part of the bishop, it does show such a state of facts as to create an implied trust. "It is admissible in a court of equity to prove a trust in opposition to a deed or other written instrument." 11 Ark. 82; 39 Ark. 309; 75 Ark. 446; 48 Ark. 175-6; 45 Ark. 472; 77 Ark. 31; 47 Ark. 535; 70 Ark. 145; 142 Mo. 274-5; 70 Ark. 150. See also 107 U. S. 163-173; 79 Ark. 559, 563, 564, 565; 17 Ark. 483.

3. The court erred in holding that the appellees stand in the attitude of *bona fide* purchasers or lien holders, and, therefore, entitled to liens. Upon the facts developed in this case, they have no standing as *bona fide* lien holders. Both the contract and specifications state that the building was for an orphanage, and they knew that they were furnishing materials to build an orphanage. Moreover, the inscription on the cornerstone was sufficient to put them on notice. 58 Ark. 84. No claim of *bona fides* was pleaded by the interveners. 27 Ark. 6; *Id.* 98; 21 Ark. 22; 30 Ark. 249; 31 Ark. 151; 29 Ark. 563; 31 Ark. 85, 87. The burden was on them to show that they were lien holders, and in good faith. 75 Ark. 228; 80 Ark. 86.

4. They have not complied with the law so as to entitle them to liens. Kirby's Dig. § 4981; Jones on Liens, § 1422.

5. The bond of the American Bonding Company is only a bond of indemnity to Bishop Morris. Its terms are complied with by turning over the "building in an undamaged condition, and free and clear of liens and incumbrances whatever, arising out of said contract. 86 Ark. 213. Neither he nor the bonding company had any privity with or contractual relations with the subcontractors. The cross complaint of the various defendants against the bonding company should not be sustained. 31 Ark. 345, 360; 48 Ark. 167; 65 Ark. 27, 30; 76 Fed. 130.

*Bradshaw, Rhoton & Helm,* for appellees.

1. As between the lien holder and the owner of the improved property, there is no necessity for filing a separate account with the clerk, where suit is instituted within ninety days after the materials are furnished, and a proper account

thereof accompanies the complaint.    49 Ark. 475;    57 Ark. 284; 58 Ark. 7; 30 Ark. 568; 51 Ark. 302.

2.   A church or orphanage is subject to a mechanic's lien.   The case of *Eureka Stone Co.* v. *First Christian Church*, 86 Ark. 212, should be overruled.   The statute is broad enough to include a church or orphanage as much so as if the words church or orphanage were in terms mentioned in the statute.   Kirby's Dig. § 4970; 30 La. Ann. 711; 29 Ore. 150; 10 Pa. St. 413; Matthew, 22: 21; Romans, 13: 7-8; 32 Ark. 406; 56 Ark. 217.   The deed of conveyance to John B. Morris, by its terms, conveys an estate in fee simple "unto him, and unto his heirs and assigns forever," and is not chargeable with a trust.   While it is true that the legal title may be held by one and still be held in trust, yet that is a question of fact in a contest between claimants, and can be proved only by a writing, unless the money is furnished by the claimant.   Unless there was a written declaration by John B. Morris, there could be neither an implied nor a resulting trust nor express trust in favor of the church because the property did not come from the church.   Kirby's Dig. § 3666;  42 Ark. 500;  45 Ark. 481; 67 Ark. 526.

There can be no trust for a charitable use in this building because there is no person to demand and no court to compel its use as such.   Pingrey on Real Estate, § 1521; 95 N. Y. 76;  125 N. Y. 560;  130 N. Y. 29;  2 Powell on Devises, 11;  2 How. (U. S.) 127, 11 Law. Ed. 205;  6 Cyc. 899;  *Id.* 945, note 24; *Id.* 946;  67 Am. Dec. 160;  Eaton, Equity, 385; *Id.* 387, note 8, 388; note 12, 389; 26 Mich. 153;   55 N. J. Eq. 204;   161 Mass. 400;   14 L. R. A. 33;   27 Barb. 260;   91 Fed. 827.

If it should be admitted, contrary to the instruments of conveyance, the testimony of appellant and the practice, customs and inclination of the Catholic Church as shown by its history and traditions, that there is lodged in the church, or its members, or any part  of them, an expectation or wish that appellant, the bishop, should make no disposition of any of his property, or of the property he holds, except for the use of the church or for some charitable purpose connected with it, the absolute discretion of disposition vested in him places it beyond the power of the court to do anything in furtherance

of any such expectation or wish.   14 L. R. A. (N. S.) 49; *Id.*
68, 75, 80, 87;  28 Mich. 153;  9 Ves. Jr. 401;  10 Ves. Jr. 522;
7 Heisk. 683;  54 N. J. Eq. 205.   This absolute power of dis-
position and control carries with it the power to create liens.
57 Ark. 445.

The   material   furnishers   are   innocent   purchasers
without notice of a secret trust, if any;  and the court correctly
held that  appellees were each *bona fide*  purchasers as lien
holders, and entitled to liens because they had furnished
materials and done work on the building without notice that
appellant held the property as bishop.   Where one of two
innocent persons must suffer by the act of a third person,
he must suffer who  enabled the third to occasion the loss.
39 Ark. 50;  42 Ark. 478;  49 Ark. 44;  55 Ark. 49.

The bonding company contracted to pay for all labor
and materials used in the erection of the building.   The under-
taking in the bond that "the said contractor shall faithfully
execute the contract for the erection of said building, and that
he shall pay off and discharge all claims for labor and material
of whatever kind used in the construction of said building,"
is a clear and explicit promise to pay for labor and materials
used therein;  and the additional statement that "the con-
tractor shall turn over the building  free and clear of all liens
and incumbrances," is but a cumulative provision, making com-
plete sense within itself.   9 L. R. A. (N. S.) 889.

WOOD, J.   Appellant   John   B.   Morris   entered  into  a
contract with Hugh McLennan to erect a building to be used
as an orphanage.   Appellees furnished to McLennan material
which was used in the construction of the building.   McLennan
did not pay for the material.   McLennan  executed a bond
to Morris with appellant  bonding company as surety in which
it undertakes that the contractor "shall pay off and discharge
all claims for labor and material of whatever kind used in the
construction of said building,  * * *  and shall turn over said
building free and clear of all liens and incumbrances whatever,
of mechanics or material men, that may arise out of said con-
tract."

The questions presented on this appeal are:

First.   Did appellees have a lien on the building for the
amounts due them?

Second.  Is the bonding company liable for such amounts?

Third.  Can appellees recover of appellant Morris, and have a lien on the building for the amounts due them on the theory that they stand in the attitude of innocent purchasers for value?

1.  Appellant Morris contends that the building is dedicated to a public charity, and is therefore not subject to the liens claimed.  Appellees, on the other hand, contend that Morris owns the building in his individual right, in fee simple, and that it is not chargeable in his hands with any trust, that there has been no irrevocable dedication of the building by Morris to a public charity, no specific charity designated and declared, and therefore that it is subject to the liens.

John B. Morris is bishop of the Catholic Church of the diocese of Little Rock.  In 1859 Andrew Byrne, the then bishop of above diocese, by will bequeathed all the property of which he should be possessed at the time of his death, to be conveyed by proper deeds to his successor "for the use and benefit of all persons professing and practicing the Roman Catholic faith in Arkansas," and directing that the same be applied "according to the discipline, canons and usages of the Roman Catholic Church in the United States of America."

In 1879 the chancery court of Pulaski County found that Edward Fitzgerald, as the "immediate" ecclesiastical successor of Andrew Byrne, "became, and was in law and equity, entitled to be invested with the title to the lands mentioned in the will, and, as the trustee designated to make the deed had died, the court declared that it was its duty to "see that the said trust doth not fail for the want of an agent to execute it." The court further found that it was not "for the interest of said church in said diocese to restrict those who hold the property of the church in trust in any way in the exercise of the power to convey the title to any land within the scope of their duties acquired," and, "to the end that said will and testament of said Andrew Byrne" should "remain no longer unexecuted," the court decreed that Edward Fitzgerald "be vested with the full, absolute title and estate in all the lands described as an estate of inheritance and in fee simple to him and his heirs and assigns forever."  A commissioner was appointed to make the deed. and he executed same on the 18th day of December,

1879, and it was on that day approved by the court. The deed recited that a commissioner and trustee in chancery was appointed to make conveyance to Edward Fitzgerald "to the end that the last will and testament of the said Andrew Byrne shall be executed."

On the 25th of May, 1906, Edward Fitzgerald made a will which recited in part as follows:

"I, Edward Fitzgerald, of the city of Little Rock, in the county of Pulaski, and State of Arkansas, commonly known as the Roman Catholic Bishop of Little Rock, being in feeble health but of sound mind, disposing memory, do hereby make this my last will and testament.

"First. I leave to my brother, Joseph Fitzgerald, of the city and State of New York, the sum of five dollars.

"Second. All the rest and residue of my estate, real, personal and mixed, and choses in action, whether acquired by me in my capacity as bishop of Little Rock or in my personal capacity, of which estate I may be seized or possessed or to which I may be entitled at the time of my death, I devise, give and bequeath to the Right Reverend John B. Morris, Coadjutor to the Roman Catholic Bishop of Little Rock, Arkansas."

In July, 1906, Bishop Fitzgerald executed the following instrument:

"Edward Fitzgerald to John B. Morris.

"Deed of Conveyance.

"Know all men by these presents: That I, Edward Fitzgerald, Bishop of Little Rock, for and in consideration of one dollar ($1) to me in hand paid, do hereby grant, quitclaim and convey to my coadjutor, John B. Morris, of the city of Little Rock, all my property of every kind, real and personal and all bonds, bills and notes, and evidences of debt, books, pictures and everything that belongs to me, in whole or in part. To have and to hold unto him and to his heirs and assigns forever. On the consideration that said Morris shall pay to me as an annuity during my life the sum of ten thousand ($10,000) dollars per annum, payable on the first day of each and every month."

Bishop Morris testified that under the discipline of his church the church property was vested in the bishop of the

diocese, that it was vested in him personally. He did not own all of the public charities of his church in the diocese, some of these were owned by religious orders, such as monks and sisters. The St. Joseph's Orphanage and St. Vincent's Hospital were in his name. The St. Joseph's Orphanage (the building in suit) was built by him personally out of his own funds, but he intended it for a public charity. It had never been used in any other way, and was then being administered as such by the Benedictine Sisters, a religious order of the Catholic Church. He bought the land on which the orphanage was situated for an orphan asylum. Orphans are admitted there, regardless of creed. No one is refused who is really in need. It had always been known as St. Joseph's Orphanage, and universally so in the community so far as he knew. The building has a tablet on the original cornerstone and also an inscription over the main entrance indicating its purpose. The funds with which the orphanage was built came to him not as bishop but as a private individual. It was pretty hard in his office to distinguish between bishop and person. Everything he held practically was because he was bishop. He held all the property in the diocese as a private individual. He received a large amount of property from his predecessor, Edward Fitzgerald. He had no reason whatever to believe that this would have been given him except the fact that he was coadjutor bishop and expected to become the successor to Bishop Fitzgerald. He was sure that it would not have been given him but for that fact. Morally and ecclesiastically, it would be impossible for him to give it (the property) away for any private purpose except purposes of the church. All the funds in his hands are held the same way. All the funds in his name and the funds with which he built St. Joseph's Orphanage were funds that he held in a way that morally and ecclesiastically he could not use for any other than charitable church and religious purposes. One of the chiefest works of the church was charity. The will of Bishop Byrne and the decrees of the chancery court, giving it effect, vested in Bishop Fitzgerald the legal title in fee to the property described, "for the use and benefit of all persons professing the Roman Catholic faith in Arkansas, to be applied according to the

discipline, canons and usages of the Roman Catholic Church in the United States of America."

In other words, the will and decree, when construed together and as a whole, created an express trust in Bishop Fitzgerald for the Catholic Church. Neither the will nor the deed of Bishop Fitzgerald to Bishop Morris created an express trust in the latter as to the property mentioned in these instruments, for neither of them declares a trust; and under our statute and decisions an express trust of lands can only be established by a declaration thereof in writing. Section 3666, Kirby's Dig.; *Robinson* v. *Robinson,* 45 Ark. 481; *Salyers* v. *Smith,* 67 Ark. 526. But under our statute and decisions a conveyance of land, absolute upon its face, nevertheless may be shown to be in trust. Section 3667, Kirby's Digest; *Crittenden* v. *Woodruff,* 11 Ark. 82; *McMurrey* v. *Mobley,* 39 Ark. 309; *Richards* v. *Taylor,* 45 Ark. 472; *Atkinson* v. *Ward,* 47 Ark. 535; *Crow* v. *Watkins,* 48 Ark. 175-6; *Grayson* v. *Bowlin,* 70 Ark. 145; *Tillar* v. *Henry,* 75 Ark. 446; *Kelly* v. *Keith,* 77 Ark. 31; *McDonald* v. *Tyner,* 84 Ark. 189. See also *Condit* v. *Maxwell,* 142 Mo. 274. Mr. Pomeroy says: "The second great division of trusts, and the one which in this country especially affords the widest field for the jurisdiction of equity in granting its special remedies so superior to mere recoveries of damages, embraces those which arise by operation of law from the deeds, wills, contracts, acts or conduct of parties, without any express intention, and often without any intention, but always without any words of declaration or creation. They are of two species, 'resulting' and 'constructive,' which latter are sometimes called trusts *ex maleficio,* and both these species are properly described by the generic term '*implied trusts.*'" He continues: "Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently, or in the violation of any fiduciary duty, but the intent and theory of equity appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such a case a trust results in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real

owner." And further he says: "If one party obtains the legal title to property not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he can not equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity the beneficial owner." 1 Pom. Eq. Jur. § 155.

Now, when Bishop Fitzgerald made his will he bequeathed the property mentioned "to the Right Reverend John B. Morris, coadjutor to the Roman Catholic Bishop of Little Rock, Arkansas," and in his deed he conveys to his "coadjutor." If these words be nothing more than *descriptio personae,* they show the relation that Bishop Morris sustained to Bishop Fitzgerald and the Catholic Church at the time the deed and will were made. As coadjutor, John B. Morris was to become the successor of Bishop Fitzgerald. Under the discipline of the Catholic Church, the church property "was vested in the bishop of the diocese." The deed to Bishop Morris was without consideration, and the property was given to him by Bishop Fitzgerald. "The property would not have been given him except for the fact that he was coadjutor bishop and expected to become the successor to Bishop Fitzgerald." While Bishop Morris says in one place that the funds with which the orphanage was built "came to him, not as bishop, but as a private individual," and in another place that he "held the property as a private individual," yet, in addition to what we have already quoted, he states that "all the funds in his name and the funds with which he built the St. Joseph Orphanage were funds that he held in a way that, morally and ecclesiastically, he could not use for any other than charitable church and religious purposes." So, taking his testimony as a whole, and in connection with the will of Bishop Byrne and the decree of the chancery court, and the will and deed of Bishop Fitzgerald, there can be no doubt that the funds in his hands were the funds of his church. Therefore, under the familiar principles above announced by Mr. Pomeroy, Bishop Morris holds the property in his diocese and the funds in his hands as bishop in trust for the Roman

Catholic Church.   If he owned the property in his own right
in fee simple, he could dispose of it for his own personal bene-
fit.   It could be subjected to the payment of his individual
debts.   He could sell it and use the proceeds for his individual
and private purposes and ignore the claims of the church.   He
could give it to whomsoever he might desire, with no limitation
whatever upon its use; and if he should die intestate, the property
would go to his heirs, and not to his ecclesiastical successor.
Bishop Morris says he has no intention of ever devoting the
property to any other than the declared purposes of his church,
and no doubt he will carry out his intention.   But the question
here must be tested, not by what he will or would do, but by
what he might or could do.

In *Mannix* v. *Purcell*, 46 Ohio St. 102, 2 L. R. A. 753,
John B. Purcell was bishop of the Roman Catholic diocese of
Cincinnati.   The property in controversy there was certain
churches, school houses, asylums, etc., that had been
conveyed "to Jno. B. Purcell, his heirs and assigns forever."
Purcell made an assignment "of all his property which could
by law or in equity be subjected to the payment of his debts,
but said assignment did not include and was not intended to
include any property held in trust for others."   There was a
contention on behalf of creditors "that the archbishop was
so far the absolute owner of the property—such was his do-
minion over it that it was subject to the payment of even his
general indebtedness, and passed by the deed of assignment
to the assignee;   that there was no trust of which the civil
courts can take cognizance or assume control."   In disposing
of this contention, the court said in part:    "The questions
before us are very similar to those which would have arisen
if John B. Purcell, claiming to be in possession of this property,
had brought suit to quiet his alleged title against those who
now assert the trust, or as if, claiming to be the unqualified
owner in fee simple, he had brought his action against them
to recover possession of the several properties held by them.
The practical and substantial subject of the present inquiry
is:   have these supposed beneficaries an interest in this property
which they can assert as superior to the right of John B. Purcell
or his creditors to subject it to the payment of his debts?"
In holding that the deeds, although absolute in form, con-

veyed the property in trust, the court further said: "The parties have gone back fifteen centuries into the laws and canons of the church for proof of the nature of the tenure by which the archbishop held the legal title to ecclesiastical property; and the proof is overwhelming that he was not invested with an absolute title to it as his own. * * * It is no innovation upon the law of evidence, in determining questions like the one at bar, to call, in aid of the civil tribunal, upon the law of the particular church involved for the purpose of determining the title to church property. It surely is not unreasonable in a case like the present, to hold one of the great prelates of the church of Rome to the terms upon which, by the very law to which he has avowed his fealty, he has consented to accept the legal title to property which is appointed to the uses of the church to whose service he has with most solemn unction dedicated his life." The testimony of Bishop Morris shows that he acquired the property in controversy under the laws and canons of his church, and that according to those laws and canons he could not morally and ecclesiastically use it for any other than charitable, church and religious purposes. In other words, he holds the property in trust for his church. While not concerned about matters of discipline and doctrine in churches, the civil courts nevertheless, where property rights are involved, will look to the canons, laws and usages of a church to determine how property has been acquired and how it should be held and disposed of. *Mannix* v. *Purcell*, *supra: Sanders* v. *Baggerly*, 97 Ark. 177. Equity will compel the trustee to administer the trust according to the laws and usages of the church by which the trust is created and which govern in the acquisition and disposition of the property. In a court of conscience a trustee will not be heard to say: "Morally, I was bound to do a certain thing, but legally I can do another." As was said by Lord Chief Justice Wilmot: "Trusts are always imperative, and are obligatory upon the conscience of the party intrusted." *Attorney General* v. *Downing*, Wilm. 23. Our own court in *Gainus* v. *Cannon*, 42 Ark. 512, said: "Whenever a thing is done by one under an obligation or duty to do that thing, he will be presumed in equity to have done it in pursuance of his obligation or duty." Therefore, when Bishop Morris bought the land upon which the building

in controversy was placed, and erected the building thereon with funds which he had received as bishop of the Catholic Church, and because of that fact he paid for the land and building with funds which in equity, according to the canons of the Catholic Church, were the funds of that church, and although he took the title in his own name by deed absolute upon its face, there was,. nevertheless, an implied trust in favor of his church.

Appellees contend that, even if the property in controversy belongs to the Roman Catholic Church, there has been no irrevocable dedication of the building to the use of a public charity, and that such dedication is necessary before the property could be held as exempt from their claims. There can be no well grounded reason for a distinction between the property of the Roman Catholic Church in this respect and the property of any other church, organization, or society engaged in public charities. Bishop Morris testified "that one of the chiefest works of the church was charity," and his testimony shows that the building in controversy was built as an asylum for orphans regardless of creed; that it was dedicated according to the solemn rites of his church as an orphan asylum. It is designated by suitable inscriptions as an orphanage. While the bishop had the power to change its use at any time, he had never contemplated using it for any other purpose than an orphanage; such was his present intention, and he thought it would be permanently used for that purpose. It is true that the bishop had the unlimited power of disposition over the property for the purposes of his church. With nothing in the grant restricting it, he could at any time change it from an orphanage to a private school. He could convert it to commercial uses, devoting the proceeds to "religious and charitable purposes." The sovereign power of the church in the alienation and use of the property for church purposes is lodged in the bishop as the head of the church. But precisely the same power is possessed by other churches, though it may be exercised in a different manner, being delegated to other and different functionaries. But the power exists, and is constantly exercised in the disposition and management of church property. The fact that the property is owned by the church and is being by it devoted to the use

of a public charity is sufficient under the doctrine announced in *Fordyce* v. *Woman's Christian Lib. Assn.*, 79 Ark. 550, and *Eureka Stone Company* v. *First Christian Church*, 86 Ark. 213, to exempt it from the statutory lien, whether there was an irrevocable dedication or not. In the case of *Grissom* v. *Hill*, 17 Ark. 483, this court held that a mechanics' lien could not be enforced on a church house. But in that case the deed of the grantor to the lot upon which the church was built provided that the "lot of land is never to be sold, or to be used in any other way, only for the use of a church." In that case there was an irrevocable dedication by the grantor in the deed to the use of a public charity. So the question here presented was not in issue in that case. But in the cases of *Fordyce* v. *Library Assn.* and *Eureka Stone Co.* v. *First Christian Church*, *supra*, the question was directly presented. In the case of *Fordyce* v. *Association*, the patent to the association contained no limitations or restraint upon alienation or use of the lots granted, and in fact the lots were not in actual use, for at that time no building had been erected thereon, and there was no written declaration upon the part of the association that the lots were to be used perpetually for public charity. This court, nevertheless, in that case held that the lots could not be sold under an execution lien. Judge Rose, special judge, speaking for the court, commenting upon the clause of the deed in *Grissom* v. *Hill*, which contained an irrevocable dedication for church purposes, said: "The clause in the deed above mentioned cut no figure in the case whatever." In the case of *Eureka Stone Co.* v. *First Christian Church*, *supra*, this court quoted the above language from *Fordyce* v. *Lib. Assn.*, and, following that case, held that a mechanics' lien can not be asserted against a church building, no matter whether there was a clause against alienation in the deed to the property upon which the church building was situated or not. These decisions announce rules out of which property rights could and may have arisen. Moreover, there should be some stability to the rules of law enunciated by this court and the doctrine of *stare decisis* must be applied here. "It is more important that questions involving property rights be finally settled than how settled." *Townsend* v. *Martin*, 55 Ark. 193; *Cooper* v. *Freeman Lumber Co.*, 61 Ark. 42. A deed to

Bishop Morris under the canons of his church is in legal effect a deed to the Roman Catholic Church in this diocese. If the grant had been made to the church direct, the bishop would have held the legal title in fee as trustee for his church. He represents the church. The bishop is the spiritual head of his church; and where a grant in fee is made to his church, it vests in him and his successors likewise in fee. *Pawlet* v. *Clark*, 9 Cranch 292.

We held in *Eureka Stone Company* v. *First Christian Church*, *supra*, that a church is a public charity. See also *Biscoe* v. *Thweatt*, 74 Ark. 545. An orphanage building, set apart and dedicated as this was and used as an asylum for needy orphan children, regardless of creed, comes well within the definition of a public charity given by our decisions and as recognized by our Constitution and statutes. Art. 16, § 5, Const.; section 6887, Kirby's Digest; *Phillips County* v. *Sister Estelle*, 42 Ark. 536; *Biscoe* v. *Thweatt*, *supra*; *Fordyce* v. *Woman's Christian Lib. Assn.*, 79 Ark. 550; *McDonald* v. *Shaw*, 81 Ark. 235; *Eureka Stone Co.* v. *First Christian Church*, 86 Ark. 213.

Under the above decisions, the designation of the charity is specific enough, and the dedication to the use of the public charity is sufficient to exempt the building in controversy from any statutory lien.

2. The language of the bond is substantially the same as that in *Eureka Stone Company* v. *First Christian Church*, *supra*. The meaning is the same. In that case, speaking of a similar clause, the court said: "The material men base their right to recover upon that clause of the contract which provides that the contractor shall pay all material men; but it will be observed that the subject in contemplation of the parties was the protection of the church against liens that might be asserted against the building, for that which immediately precedes, as well as that which follows, the clause in question manifestly shows that the object in view was to protect the church from the filing of liens, and to provide for their payment in case they were asserted." The obligation of the bond under consideration was discharged when the building was turned over to the bishop "in an undamaged condition and free and clear of all liens and incumbrances whatever arising

out of the contract." The purpose of the bond was to indemnify the bishop against loss. It was not made for the benefit of the material furnishers.

3. Conceding that a doctrine analogous to that of innocent purchasers could apply here, the question as to whether appellees are *bona fide* holders of liens on the building is purely one of fact. It would not serve any useful purpose as a precedent to discuss the facts concerning this. Our conclusion is that the facts and circumstances are sufficient to have put any man of ordinary intelligence and prudence upon inquiry, and that a reasonably diligent inquiry would have discovered the fact that the building in controversy was being erected to be dedicated for the use of a public charity. The plans and specifications and the contract for the erection of the building, the character of the building itself and the inscription over the door and on the corner stone gave notice of the purposes for which it was to be used, and should have led to further inquiry if there was doubt in the mind of any one as to such purpose. Such inquiry of the founder, the "Rt. Rev. Jno. B. Morris, D. D., Third Bishop of Little Rock" (as appears on the corner stone) would have revealed the facts showing the public charity. Appellees therefore can not be innocent lien holders. *Bland* v. *Fleeman*, 58 Ark. 84.

The judgment is therefore reversed, and the claims of appellees for a lien on the building and for judgment against the appellant bonding company will be denied.

McCulloch, C. J., dissenting.

ON REHEARING.

Opinion delivered October 23, 1911.

Per Curiam. A majority of the judges agree, for different reasons, on granting a rehearing and affirming the decree of the chancery court.

The Chief Justice and Mr. Justice Frauenthal are of the opinion that the facts of this case distinguish it from the cases of *Fordyce* v. *Woman's Christian Library Association*, 79 Ark. 550, and *Eureka Stone Company* v. *First Christian Church*, 86 Ark. 213, and that those cases should not be overruled.

Justices HART and KIRBY are of the opinion that the cases above referred to should be overruled, and they concur on that ground.

Mr. Justice WOOD adheres to the original opinion in the case, and therefore dissents from the conclusion of the majority.

The decree is therefore affirmed.