Patricia Ann HOWARD and Richard Scott Howard *v.* THE DALLAS MORNING NEWS, INC.

95-938                                      918 S.W.2d 178

Supreme Court of Arkansas
Opinion delivered April 1, 1996

*Rose Law Firm*, by: *James H. Druff*, for appellants.

*Ronquillo & DeWolf, L.L.P.*, and *Wright, Lindsey & Jennings*, by: *Gregory T. Jones* and *Ainsley H. Lang*, for appellees.

ANDREE LAYTON ROAF, Justice. Patricia and Robert Howard sued Dallas Morning News, Inc. (DMN), a newspaper publisher, for injuries Patricia suffered in April, 1991, when she was struck by a truck while she was walking in a pedestrian crosswalk at the Little Rock Municipal Airport. The driver of the truck was making delivery of the *Dallas Morning News* to the airport at the time of the accident. The Howards also sued Robert Mitchell, the driver, and Delivery Systems, Inc. (DSI), the regional distributor for the *Dallas Morning News*. The Howards appeal from an order granting summary judgment in favor of DMN, contending that 1) the trial court incorrectly applied the law of agency in finding that they were required to show that Mitchell and DMN intended to and did enter into a contractual relationship, and that, 2) even if they were so required, there was ample evidence from which an agency and contractual relationship might reasonably be inferred. We agree that the trial court erred in granting the summary judgment and reverse.

### 1. Facts

In July of 1989, DMN contracted with DSI to serve as distributor of the *Dallas Morning News* in the Little Rock and Hot Springs area. The contract was titled "Independent Distributor Agreement" and specified, in addition to such matters as prices and quantities of papers to be sold to distributor, terms of payment, area of distribution, and place of delivery, that the distributor would "make efficient and prompt delivery of the newspaper to purchasers in a manner satisfactory to them," which was defined as reaching the reader by or before 6:30 a.m. each day, "prevent the insertion in copies of the newspaper of any advertising and other printed material," and "obtain new purchasers of the newspaper" through reasonable solicitation and promotional methods. The agreement further provided, in a clause captioned "Independent Contractor Relationship":

> It is agreed that the means of accomplishing the foregoing objectives are wholly within the selection and control of

Distributor, that all facilities and personnel used in the work shall be under the sole control and direction of Distributor or his sub-contractors, that the Publisher shall have no right or voice with respect to the means employed by Distributor in accomplishing the foregoing objectives, the selection, control or direction of the persons engaged by Distributor in performing the work or the mode, manner or method used by Distributor in the performance of this Agreement, and that the legal relationship created by this Agreement and by the actions and conduct of the parties in the performance of this Agreement is that of independent contractor. Distributor shall have no authority, and is hereby forbidden to employ or contract with any person on behalf of Publisher, and any and all contracts or arrangements made by Distributor in respect of the work contemplated by this Agreement shall be in the name of Distributor and for his account.

The distributor was also required to keep and make available to DMN, accurate and complete records with respect to all purchasers of the newspaper, all employees and subcontractors of distributor, and all other information needed by DMN to comply with rules of the Audit Bureau of Circulations. Although the agreement was for one year and automatically renewed from year to year, it could be terminated by either party with or without cause, upon 10 days' written notice.

In December of 1989, DSI contracted with David Mitchell to serve as a "carrier" for DSI, by the execution of two separate documents, an "Independent Contractor/Carrier Agreement" and a "Delivery Systems Carrier Lease." The Agreement provided that Mitchell, as carrier, would procure from DSI and promptly deliver newspapers along a specified route, and further recited:

The means and facilities used for such purposes shall be selected and operated solely by the Carrier under his/her sole supervision, control and direction, and at his/her own cost and expense to the best interest of the Company and the faithful performance of this agreement. It is expressly agreed that the Carrier is not an employee of the Company and he/she at all times occupies the position of an independent contractor in his/her relationship with the Company. The Company is looking to the Carrier solely for the desired result of prompt receipt and delivery of newspapers.

The Agreement also required Mitchell to provide a substitute carrier when he was unable to deliver the newspapers, prohibited him from making alterations or insertions to the newspapers, and allowed him to engage in other business pursuits if they did not interfere with his contractual obligations to DSI. The Agreement was for 30 days, automatically renewed from month to month, and could be terminated by Mitchell upon 20 days' written notice or at will by DSI without notice.

The Lease Agreement required Mitchell to lease from DSI vending machines and a list of subscribers for his delivery route, and contained clauses similar to the Independent Contractor/Carrier Agreement regarding Mitchell's status as an independent contractor. The lease agreement further required Mitchell to provide information weekly to DSI regarding each retailer and vending machine on his route and to fill out forms provided by DMN and necessary for DMN to comply with regulations of the Audit Bureau of Circulations.

At the time of the accident, Mitchell was also delivering the *Wall Street Journal, National Sports Daily, Barron's,* and the *New York Times* pursuant to his agreement with DSI, and he was engaged in a separate lawn-maintenance business. Sometime after the accident, DMN learned that Mitchell had destroyed or discarded 130 copies of the paper when he could not complete his route. DMN indicated to DSI that Mitchell should be terminated. DSI's response was to terminate its contract with DMN.

After the trial court denied DSI's motion for summary judgment, DMN also moved for summary judgment, asserting that no contract existed between Mitchell and DMN, nor was Mitchell in an employment relationship with DMN. In support of its motion for summary judgment, DMN submitted the agreements between Mitchell and DSI and the agreement between DSI and DMN, affidavits of several employees of DMN and the depositions of Joe Fox, President of DSI, and a number of DMN employees. The Howards submitted portions of the deposition of Mitchell, several of the same depositions of DMN employees submitted by DMN, and the depositions of two employees of DMN's predecessor.

After granting DMN summary judgment, the trial court also granted the Howards' motion for entry of final judgment pursuant to Ark. R. Civ. P. 54(b), so that they could appeal the dismissal of

DMN prior to trial. DMN takes issue with the finality of this order and asks that this appeal be dismissed.

### 2. Finality of Order

We first address DMN's contention that the appeal should be dismissed because there is not sufficient grounds for certification under Ark. R. Civ. P. 54(b).

■ In *Franklin* v. *OSCA, Inc.*, 308 Ark. 409, 825 S.W.2d 812 (1992), we said that under Rule 54(b) the trial court "must factually set forth reasons in the final judgment, order, or the record, which can then be abstracted, explaining why a hardship or injustice would result if an appeal is not permitted." *Id.* at 412, 825 S.W.2d at 814. However, we have clarified this holding to require that the factual underpinnings supporting a 54(b) certification must be set out in the trial court's order, *see Davis* v. *Wausau Ins. Cos.*, 315 Ark. 330, 332, 867 S.W.2d 444, 446 (1993), and that the factual findings must be abstracted. *See Reeves* v. *Hinkle*, 321 Ark. 28, 899 S.W.2d 841 (1995).

■ In this case, the trial court's findings of facts contained in the 54(b) order are abstracted as follows:

> (1) Significant discovery remains to be done. Based on past events, if DMN's dismissal is reversed on appeal, it will doubtless want to re-depose experts whose depositions were taken without its participation. (2) Any subsequent trial against DMN would be protracted and largely duplicative of the first trial. DMN would be entitled to relitigate virtually all issues raised in the first trial. A protracted retrial of the same issues is highly inefficient and raises an unseemly possibility of divergent verdicts arising from identical facts. The court finds this situation indistinguishable from that in *Franklin* v. *OSCA, Inc.*, 308 Ark. 409, 412, 825 S.W.2d 812 (1992), in which the Supreme Court held an immediate appeal was warranted to avoid a duplicative trial. (3) To deny the motion would not insure there would be only one appeal, since the parties would likely appeal from both trials. To certify this appeal would avoid the prospect of multiple appeals from possibly divergent verdicts.

The trial court has not merely tracked the language of Rule 54(b). Here the abstracted order reflects that the trial court has stated facts

sufficient to justify the entry of a final, appealable order.

### 3. Misapplication of Law

The Howards first argue, in essence, that the trial court made both procedural and substantive errors of law in the order granting the summary judgment. The summary judgment order provided in pertinent part:

> The bulk of the Howards argument focuses on the factors to be scrutinized in determining whether a relationship is one of agent or independent contractor. *This, however, avoids the threshold issue of whether there was a contract between the parties. Irrespective of whether Mitchell was an agent or independent contractor, both required there to be a contractual relationship.*
>
> Agency encompasses several types of relationships wherein the one referred to as the agent has *agreed* with the one referred to as the principal or master to act for the principal or master, subject to his control. The *agreement* may be oral or written or implied from the conduct of the parties and may be with or without compensation. *See Crouch v. Twin City Transit*, 245 Ark. 778, 434 S.W.2d 816 (1968); AMI 701.
>
> . . .
>
> The Howards' argument assumes that Mitchell, in some way, contracted with DMN to perform the work, yet *it provides no proof of this. Even if it could be argued that the agreement is implied from the conduct of the parties, this does not relieve the Howards from providing some proof as to the intent of the parties to be so bound.* Clearly, Mitchell contracted with DSI, but that is not to say that it did so with DMN. (Emphasis added).

The Howards take issue with the underlined portion of the order. They contend that the trial court, by requiring them to prove as a threshold to agency liability, a contractual relationship between Mitchell and DMN, both incorrectly shifted the burden of proof from DMN to them, and also incorrectly stated the law of agency. They also contend that the trial court similarly erred by stating that they must provide some proof of the intent of Mitchell and DMN to be bound, for the agreement to be implied from the conduct of the parties.

■ The Howards correctly state that the burden of proving there is not a genuine issue of material fact is upon the summary judgment movant, and all proof submitted must be viewed in a light most favorable to the party resisting the motion. *See Cash v. Carter*, 312 Ark. 41, 847 S.W.2d 18 (1993). However, once the movant makes a prima facie showing of entitlement to summary judgment, the respondent must meet proof with proof showing a genuine issue of material fact. *Cash, supra*. Thus, if the trial court determined that DMN made a prima facie showing that it was entitled to summary judgment as a matter of law, it was proper to require the Howards to come forward with proof by showing a genuine issue of material fact, and this would not be an improper shifting of the burden of proof to them.

■ Also, although the trial court seems to have used the terms contract and agreement interchangeably in the order, and characterized the existence of a contract between Mitchell and DMN as the "threshold issue," the order correctly stated that an agency relationship requires an agreement for the agent to act for the principal, or master, and that the agreement may be oral, written, or implied from the conduct of the parties. *Crouch, supra*. However, we do agree that the trial court misstated the law by further declaring that the Howards must also provide proof that the parties *intended* the relationship to result, where the agreement is implied.

■ We have adopted the Restatement definition of agency in a number of cases. *See Crouch, supra; Evans v. White*, 284 Ark. 376, 682 S.W.2d 733 (1985). The Restatement (Second) of Agency, § 1, cmt. b (1957) provides that "the relationship of agency does not depend on the intent of the parties to create it, nor the belief that they have done so. To constitute the relationship there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relationship between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relationship to follow."

■ The Restatement further provides that the "relationship of master and servant can be created although there is no mutual agreement to give and receive assistance. It is only necessary that there be submission by the one giving service to the direction and control of the one receiving it as to the manner of performance."

Restatement (Second) of Agency § 221, cmt. c (1957).

■ On the other hand, we have defined an independent contractor as one who, exercising an independent employment, contracts to do work according to his own methods and without being subject to the control of the employer, except as to the results of the work, and have held that the right to control and not the actual control determines whether one is a servant or an independent contractor. *Wilson* v. *Davison*, 197 Ark. 99, 122 S.W.2d 539 (1938).

■ In *Blankenship* v. *Overholt*, 301 Ark. 476, 786 S.W.2d 814 (1990), we listed ten factors to be considered in determining whether a master-servant relationship or independent contract existed, as found in § 220 of the Restatement (Second) of Agency, and stated that the right of control is the principal factor to be considered in making the determination. The intent of the parties is not included among these factors. *See also Dickens* v. *Farm Bureau Mut. Ins. Co.*, 315 Ark. 514, 868 S.W.2d 476 (1994).

■ Nevertheless, the trial court's misstatement of the law alone is not a sufficient basis for reversal. We have repeatedly stated that a trial court's ruling will be affirmed if correct, even if the reason given for the decision is wrong. *Higginbottom* v. *Waugh*, 313 Ark. 558, 856 S.W.2d 7 (1993). It is unclear whether the trial court considered the proof submitted by the Howards as evidence, however, we cannot say that the trial court erred merely because he misstated the law of agency in his order. We must further consider the evidence submitted by the parties to make this determination.

### 4. Evidence of Agency

The Howards next argue that even if they were required to establish the existence of a contractual relationship between Mitchell and DMN, there is sufficient evidence from which to infer that Mitchell was in fact both DMN's agent and its contractual employee. We agree that the Howards have provided proof of a genuine issue of material fact.

The Howards suggest there are numerous instances of control exerted on Mitchell by DMN, as evidenced by DMN's contract with DSI and from the deposition testimony provided with the response to DMN's motion. This evidence and the Howards' characterization of it may be summarized as follows: DMN admitted its

strong interest in how Mitchell performed because the newspaper could not function without timely delivery. DMN planned Mitchell's business. The contract between DSI and DMN contains provisions which can only be described as controls over the scope and manner of delivery: territorial routes were assigned, insertion of other materials was prohibited, strict record-keeping was required and substitution of carrier was required if Mitchell could not perform. Through DSI, DMN supplied Mitchell with virtually all the supplies, forms and equipment he needed, with the exception of his vehicle. The paperwork supplied by DMN was extensive and complicated. DMN's district manager acknowledged that he rode with Mitchell on one occasion on certain routes to service his racks. DMN roadmen would visit from time to time and follow carriers to observe the manner and method of distribution in order to verify performance of the contract. DMN structured the system under which Mitchell was paid what amounted to a salary. DMN effectively terminated Mitchell when it became dissatisfied with his performance. DMN confirmed its controlling role in delivery by delivering Mitchell's route after causing his discharge.

DMN counters these contentions with the following assertions: There was no evidence that DMN provided any form of compensation to Mitchell, or paid any insurance or other employment benefits. Mitchell was free to deliver the paper by whatever method he chose. Mitchell chose where to locate and service racks. There was no evidence that DMN had an interest in how Mitchell performed his job or that DMN planned Mitchell's business. DMN's contract with DSI is not evidence that DMN exercised control over Mitchell. Mitchell never perceived himself as an employee of DMN. There is no evidence that DMN provided any supplies directly to Mitchell and, the carrier route list was not furnished by DMN to Mitchell. A DMN employee would ride with DSI's carrier only on occasion, to either monitor compliance by DSI with the terms of its contract, or to analyze rack-sale performance for DMN's own benefit or at the request of the independent distributor. DMN did not terminate Mitchell; DSI terminated the contract because DSI feared that DMN might terminate it for poor performance, not because DMN learned Mitchell was still delivering the paper. DMN assumed delivery of the paper in Little Rock upon DSI's termination of the contract in order to assure service to readers while DMN arranged for a new contractor.

■ The Howards rely on *Karcher Candy Co.* v. *Hester*, 204 Ark. 574, 163 S.W.2d 168 (1942), to support their contentions that Mitchell was DMN's agent. In *Karcher*, Hester's son was employed by Karcher's driver to aid him in delivering beer with Karcher's permission, and Karcher paid the driver one cent more per case to enable the driver to pay the helper. We determined that this was sufficient evidence to show that the relationship of master and servant existed between Karcher and the driver's helper, stating:

> The relation of master and servant between two persons may be shown by proving that the one performs services for the other. [citation omitted] Indeed, it would be difficult, in most of these cases, to prove the relation of master and servant except by the fact that the one is known to perform service for the other, or from their course of dealings.
>
> * * * *
>
> The relationship may be created by express contract, but this is not essential; it may be created as well by conduct which shows that the parties recognize that one is the employer, or master, and that the other is the employee or servant. Moreover, when one is sought to be held responsible for the tortious act of another under the principle *respondeat superior*, the question of responsibility will not depend entirely upon the existence of some actual contractual relationship of master and servant. It is sometimes allowable to prove the relation of master and servant by the fact that one performs service for another.

*Karcher, supra.*

However, in *Jumper* v. *L & M Transport. Inc.*, 296 Ark. 319, 756 S.W.2d 901 (1988), this court concluded that the driver of a tractor-trailer rig was not an employee or agent of L & M, but was an employee of Jimmy Sellers, who leased the rig to L & M because: (1) Sellers owned the truck and leased the truck to L & M; (2) Sellers employed the driver; (3) Sellers was responsible for qualifying the driver; (4) L & M had no authority to hire or fire the driver; (5) L & M did not pay the driver's wages or social security; and (6) Sellers told the driver the routes he was to drive.

Although we have not previously considered whether a newspaper carrier is an agent of the publisher, a number of other juris-

dictions have addressed this issue. In *Murrell v. Goertz*, 596 P.2d 1223 (1979), the Oklahoma Court of Appeals held that a newspaper publisher would not be liable for damages resulting from an assault and battery by a carrier hired as an independent carrier salesman by a friend who was himself an independent contractor of the publisher. Although the publisher had ultimate control over territorial boundaries of the paper route, required that deliveries be completed by 6:00 a.m., set policy that all papers were to be held by rubber bands, and provided that customers missed by the carrier were to call the publisher, the independent contractor of the publishing company testified that he had hired the person charged with assault as an independent carrier salesman, and that the carrier was responsible only to him for delivery of the newspaper and was in no way under the supervision, dominion, and control of the publishing company. However, the publisher in *Murrell*, unlike DMN, had no direct contact with the carrier and had no knowledge of his employment.

▆ Although agency is a question of fact ordinarily determined by the trier of fact, where the facts are undisputed, and only one inference can reasonably be drawn from them, it becomes a question of law. *Evans, supra.* Here, the Howards presented evidence of control by DMN not only as to the results to be achieved — timely delivery of the newspapers, but also as to certain details of the work. We cannot say that only one inference could reasonably be drawn from the proof submitted by the Howards as evidence of the extent of control DMN exercised over Mitchell.

Reversed and remanded.

DUDLEY, J., not participating; GLAZE and BROWN, JJ. dissent.

ROBERT L. BROWN, Justice, dissenting. The central issue in this case is whether David Mitchell was an employee or an independent contractor of the Dallas Morning News. The threshold determination in such cases is whether Mitchell had the authority to act for the publishing company. *See, e.g., McMahan v. Berry*, 319 Ark. 88, 890 S.W.2d 242 (1994); *Pledger v. Troll Book Clubs, Inc.*, 316 Ark. 195, 871 S.W.2d 389 (1994); *Jumper v. L & M Transp., Inc.*, 296 Ark. 319, 756 S.W.2d 901 (1988); *Johnson v. Timber Corp.*, 295 Ark. 622, 752 S.W.2d 241, *set aside on rehearing on other grounds*, 295 Ark. 663-A, 758 S.W.2d 415 (1988); *Schuster's, Inc. v. Whitehead*, 291 Ark. 180, 722 S.W.2d 862 (1987); *Evans v. White*, 284 Ark. 376,

682 S.W.2d 733 (1985); *Crouch* v. *Twin City Transit,* 245 Ark. 778, 434 S.W.2d 816 (1968). Our law in Arkansas is absolutely clear on that point.

In 1968, this court adopted the Restatement of Agency standard of what is required to create an agency relationship. *See Crouch* v. *Twin City Transit, supra.* We acknowledged that an agency relationship is created as a result of conduct by two parties manifesting that one of them is willing to have the other act for him subject to that party's control, and the other party consents to act. Absent an agreement, there must be conduct evidencing this relationship. The majority and I agree on this point, and caselaw in this state bears it out. *See, e.g., Schuster's, Inc.* v. *Whitehead, supra; Evans* v. *White, supra; Karcher Candy Co.* v. *Hester,* 204 Ark. 574, 163 S.W.2d 168 (1942); *see also* AMI Civ. 3d 701 and 707.

Where the majority opinion falls short, in my judgment, is in its failure to identify proof of conduct by Dallas Morning News and David Mitchell to create such a relationship. What the majority does instead is present circumstances that might prove some control by the Dallas Morning News over Mitchell. Whether Dallas Morning News was interested in results and effective delivery of its papers rather than control over the details of the work is debatable. *See generally Blankenship* v. *Overholt,* 301 Ark. 476, 786 S.W.2d 814 (1990). But even assuming for purposes of summary judgment review that these circumstances manifest some control, that analysis does not satisfy whether the publisher's conduct evidenced that Mitchell was acting for it *and* conduct by Mitchell that he consented to act for the Dallas Morning News.

The contractual arrangements in this case certainly give no indication that an agreement was struck between Dallas Morning News and Mitchell. Dallas Morning News contracted with Delivery Systems, Inc. to serve as its distributor in the Little Rock area. The Independent Distributor Agreement between the parties stated that Delivery Systems would have "sole control" over its personnel, including their selection and their work performance. It further stated that Delivery Systems was an independent contractor and added:

> Distributor [Delivery Systems] shall have no authority, and is hereby forbidden, to employ or contract with any person on behalf of Publisher [Dallas Morning News]. . . .

Delivery Systems then contracted with David Mitchell as a carrier and entered into an Independent Contractor/Carrier Agreement as well as a Delivery Systems Carrier Lease. The Independent Contractor/Carrier Agreement specified that Mitchell operated solely under his own supervision as an independent contractor and that Delivery Systems was only interested in the "desired result of prompt receipt and delivery of newspapers."

Mitchell did destroy 130 newspapers,[1] and when Dallas Morning News found out about this, the publishing company was upset. According to Joe Fox, president of Delivery Systems, the "impression" was left with him that if Delivery Systems wanted to keep the contract with Dallas Morning News, it would have to terminate the contract with Mitchell. Rather than do this, Fox ended the contract with Dallas Morning News. But in discussing these circumstances in his deposition, Fox made it clear that the Dallas Morning News knew that it did not have the authority to terminate Mitchell. And Mitchell made it clear in his depositions that he worked for Delivery Systems.

The majority appears to hinge its opinion on Comment C to *Restatement (Second) of Agency* § 221 (1958), which requires that there be submission by the one giving service to the directions and control of the one receiving it as to the manner of performance. Comment C to §221 further states that if one manifests consent that another shall be his servant and work is in fact done upon his account, the one employed is the servant of the one employing, although there is no intent to receive the service. Again, there is no proof of conduct in this case on Mitchell's part to submit to the directions and control of Dallas Morning News, and no conduct by Dallas Morning News consenting to the fact that Mitchell was in its employ.

The one case cited in the majority opinion which had approximate facts stands for the point that no employment relationship existed. *See Murrell v. Goertz*, 597 P.2d 1223 (1979). In *Goertz*, there was a tier of two independent-contractor relationships, as in the instant case. In short, the majority has presented no precedent for eliminating the necessity for some implied agreement based on

---

[1] Presumably, this occurred after Mitchell's accident with the Howards, but that fact is unclear from the record.

conduct. But that is what the majority opinion does by inferring an agency relationship solely based on aspects of control exercised by Dallas Morning News. Again, whether Mitchell's conduct proved in any form or fashion that he submitted to this control is not even addressed. And the record reveals there is no such proof.

On the Howards' second cause of action, the circuit judge denied summary judgment to Delivery Systems, and their case against that party will go to trial. In the case against Dallas Morning News, however, I cannot see eliminating one essential factor for determining agency and employment which has been the law in Arkansas for decades and which the Restatement on Agency contemplates.

For these reasons, I would affirm.

GLAZE, J., joins.