Loren JONES and Linda Jones, Plaintiffs,

v.

FILER, INC. d/b/a Midas Muffler Shop and Midas International Corporation, Defendants.

No. Civ. 98–2127.

United States District Court, W.D. Arkansas, Fort Smith Division.

April 5, 1999.

Todd L. Griffin, Law Offices of Gary Green, Little Rock, AR, for plaintiffs.

David B. Vandergriff, Fort Smith, AR, for defendants.

## *MEMORANDUM OPINION*

DAWSON, District Judge.

This case presents the question of whether a franchisor is liable for the allegedly negligent acts of its franchisee. Currently before the court is a motion for summary judgment filed on behalf of Midas International Corporation ("Midas") and plaintiffs' response thereto. Trial is currently set to begin April 19, 1999. For the reasons set forth below, the motion will be granted.

***Facts.***

Plaintiffs allege that on three separate occasions in 1996 and 1997, Filer, Inc. ("Filer") d/b/a Midas Muffler Shop in Fort Smith, Arkansas, performed work, or failed to perform work, on the brakes of a 1991 Honda Civic owned by Ron Hall. Specifically, plaintiffs allege that Hall took his vehicle to the Midas Muffler Shop on June 26, 1997, to have the brakes repaired. Later that day, after Hall picked his vehicle up from the Midas Muffler Shop, he drove it to Laclede County, Missouri, where he was involved in an accident with plaintiffs. Plaintiffs contend that Hall's brakes quit working and, in an attempt to avoid the vehicles in front of him, he swerved and collided with the vehicle driven by plaintiff Loren Jones. Hall was killed in the accident and plaintiffs were severely injured.

Plaintiffs filed this action against Filer d/b/a Midas Muffler Shop asserting that it negligently failed to properly repair or replace the brakes on Hall's vehicle and that such failure was the proximate cause of their damages. In addition, plaintiffs assert a state law claim of outrage.

Filer operated the Midas Muffler Shop pursuant to an agreement with Midas called the Midas Franchise and Trademark Agreement (the "Franchise Agreement"). Plaintiffs named Midas as a defendant on the basis that Midas, as the franchisor, was responsible for the alleged negligence of the Midas Muffler Shop.

Midas asserts that it cannot be held liable for the allegedly negligent acts of the Midas Muffler Shop because it has no control over the operations of the Midas Muffler Shop. Midas asserts that under the Franchise Agreement, Ronald Filer, as President of Filer, is solely responsible for the management and operation of the Midas Muffler Shop. Ron Filer stated, in an affidavit filed in support of Midas' summary judgment motion, that:

Filer, Inc. is solely responsible for the management and operation of the Midas Muffler Shop. Filer, Inc. collects all of the income from shop operations and pays all operational expenses. Midas International receives a monthly royalty payment and payments for goods purchased, but does not participate in the shop's net profits or losses. All personnel who have worked for the Midas Muffler Shop from the beginning of the term of the Agreement have been employees of Filer, Inc. Filer, Inc. has always been responsible for hiring, firing, setting the wages, and supervising those employees. *Affidavit of Ron Filer,* at ¶ 3. Ron Filer also asserts that Filer, Inc., owns or leases all of the property and equipment used in the operation of the Midas Muffler Shop. *Id.,* ¶ 4.

Midas further asserts that it has no control over repairs, inspections, or any of the acts for which plaintiffs allege it is responsible. Midas contends that the only remedy that it has to control the activities of the Midas Muffler Shop is to terminate the Franchise Agreement. In addition, Midas asserts that the mere existence of a franchise agreement is insufficient to support a claim of actual agency.

With respect to an agency relationship, the Franchise Agreement states:

This Agreement does not in any way create the relationship of principal and agent between Midas and Franchisee, and in no circumstances shall Franchisee be considered an agent of Midas. Franchisee shall not act or attempt to act, or represent himself, directly, or by implication, as an agent of Midas or in any manner assume or create or attempt to assume or create any obligation on behalf of or in the name of Midas, nor shall Franchisee act or represent himself as an affiliate of any other authorized Midas Franchisee.

*Franchise Agreement,* § 6.14 at 7.

Plaintiffs assert that an agency relationship exists between Midas and Filer because under the Franchise Agreement, Filer is given the authority to act for Midas.

For example, plaintiffs cite to the Franchise Agreement where it states that Filer obtains the right to "purchase from Midas and to resell from said shop those genuine Midas products listed in Schedule A attached hereto, and to sell and install said genuine products in or from Franchisee's shop." *Id.,* § 1.1 at 1. In addition, plaintiffs rely on the section of the Franchise Agreement dealing with ownership of Proprietary Marks. Specifically, the Franchise Agreement states that the "Franchisee hereby acknowledges the validity of the Proprietary Marks, and acknowledges that the same are the sole property of Midas." *Franchise Agreement,* at § 2.1 at 2. The Franchise Agreement gives Filer the right to use Midas' Proprietary Marks during the term of the agreement. *Id.*

Plaintiffs also point to the following section of the Franchise Agreement regarding the Midas warranty:

All products purchased by Franchisee from Midas, including those covered by specific guarantees as set forth in Section 5.3, are warranted by Midas to the ultimate consumer for 90 days from the date of such consumer's purchase against defects in materials and workmanship. If a product disclosing any such defect is returned to Franchisee within such time, whether the product was installed by Franchisee or any other Midas franchise, Franchisee shall replace the product by installation of another genuine Midas product of like grade and quality and which is proper for the application as specified in the Midas parts catalogue or product bulletins issued pursuant thereto, and shall make no charge whatever to the customer either for the product or the installation thereof. Upon compliance with policies and procedures then in force governing the return of such defective products, Franchisee shall be entitled to credit in an amount equal to the then current price at which such product is being offered by Midas to Franchisee, plus the cost of shipping

such product back to Midas or, its supplier as directed by Midas, but exclusive of any other freight or any other applicable charges.

*Id.,* § 5.2 at 5.

Section 5.3 of the Franchise Agreement contains similar language with respect to Filer's obligation to honor certain Midas guarantees. Plaintiffs allege that these sections show that Filer has the authority and duty to act of behalf of Midas.

In addition, plaintiffs assert that Midas exerted control over Filer. For example, plaintiffs state that Midas admitted that it controlled the activities of Filer through the remedy of termination. Plaintiffs also allege that Midas controls Filer by requiring that it use Midas' Proprietary Marks; that it purchase and sell Midas products; that it perform genuine Midas services; and that it honor Midas warranties and guarantees. Plaintiffs also point to the fact that Midas provided Filer with a training program and agreed to provide additional counseling with respect to the management and operation of Filer's shop. *See Franchise Agreement,* at § 3.1(c) at 3. Midas also promises under the agreement to purchase advertising promoting the products and services sold by its franchises. *Id.,* at § 3.1(d) at 3.

Finally, plaintiffs cite to the provisions of the Franchise Agreement that set forth Filer's obligations with respect to the operation of its shop. For instance, Midas requires Filer to "keep his shop open to the public during all normal business days and hours throughout the year"; "maintain an inventory of those genuine Midas products listed in Schedule A"; and "maintain interior and exterior painting and decor in such manner and form as may be reasonably prescribed from time to time by Midas." *Id.,* at § 6.1 at 6.

### Summary Judgment Standard.

The Court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.,* 477 U.S. at 252, 106 S.Ct. at 2512. The Court views the evidence in favor of the nonmoving party, giving that party the benefit of all justifiable inferences that can be drawn in its favor. If reasonable minds could differ as to the import of the evidence, judgment should not be granted. *Id.,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. The nonmoving party must, however, set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### Agency.

The Franchise Agreement states that the "validity, construction, performance, and enforcement" of the agreement "shall be governed by the laws of the state in which the shop is located." *Franchise Agreement,* at § 10.12 at 16. Thus, Arkansas substantive law will be applied in this case.

The Court will now address the nature of the relationship between Midas and its franchisee, Filer. A franchisor may be held liable for acts of his franchisee when the actual relationship between them is that of principal and agent or master and servant. *See generally* 62B Am.Jur.2d, *Private Franchise Contracts* § 491, at 406 (1990). Thus, the Court must determine whether an agency relationship exists between Midas and Filer.

"The burden of proving an agency relationship lies with the party asserting its existence." *McMahan v. Berry,* 319 Ark. 88, 90, 890 S.W.2d 242 (1994) (citation omitted). "[A]gency is a question of fact ordinarily determined by the trier

of fact, [however], where the facts are undisputed, and only one inference can reasonably be drawn from them, it becomes a question of law." *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 103, 918 S.W.2d 178 (1996).

 "The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents to so act." *Columbia Mut. Cas. Ins. Co. v. Ingraham*, 47 Ark.App. 23, 34, 883 S.W.2d 868 (1994). "The two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control." *McMahan*, 319 Ark. at 90, 890 S.W.2d 242.

 "A principal or master may ... be vicariously liable for the tortious acts of its agent or servant within the scope of the agency or employment." *National Bank of Commerce v. HCA Health Services of Midwest, Inc.*, 304 Ark. 55, 58, 800 S.W.2d 694 (1990). The Arkansas courts have adopted the Restatement definition of agency and have quoted comment b to the Restatement (Second) of Agency § 1 which states:

> "the relationship of agency does not depend on the intent of the parties to create it, nor the belief that they have done so. To constitute the relationship there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relationship between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relationship to follow."

 *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 99, 918 S.W.2d 178 (1996) (*quoting* Restatement (Second) of Agency § 1, cmt. b). Further, the " 'relationship of master and servant can be created although there is no mutual agreement to give and receive assistance. It is only necessary that there be submission by the one giving service to the direction and control of the one receiving it as to the manner of performance.' " *Howard*, 324 Ark. at 99, 918 S.W.2d 178 (*quoting*, Restatement (Second) of Agency § 221, cmt. c (1957)).

In deciding whether a given individual or entity is an agent or an independent contractor, the Arkansas courts have considered the ten factors found in § 220 of the Restatement (Second) of Agency: (a) the extent of control which, by agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business. *Blankenship. v. Overholt*, 301 Ark. 476, 479, 786 S.W.2d 814 (1990).

 Midas essentially argues that the most essential element of agency is control and plaintiffs have failed to provide any evidence of control. *See, e.g., BE&K Constr. Co. v. Carpenters*, 90 F.3d 1318, 1326 (8th Cir.1996) ("An essential element of any agency claim is that the asserted principal has the right to control the actions of the asserted agent."). Plaintiffs simply argue that the existence of an agency relationship is a question of fact for the jury to decide. As stated above, however, where the facts are undisputed, and only one inference can reasonably be drawn from them, the existence of an agency relationship becomes a question of law.

The Third Circuit of Appeals has stated that:

the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship. Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties.

*Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 (3rd Cir.1978) (string citations omitted).[1] The fact that the Franchise Agreement expressly denies the existence of an agency relationship, however, is not determinative of the issue. *Id.* (*citing* Pennsylvania law).

In this case, there is no evidence that Midas exercised actual control over Filer, and, in fact, Ron Filer asserts that Midas exercises no control over his shop. *See Ron Filer's Affidavit.* Plaintiffs offer no evidence to dispute Ron Filer's affidavit other than the various provisions of the Franchise Agreement. The Court believes, however, that under the terms of the Franchise Agreement, Filer is merely the recipient of a license granted by Midas to operate a shop under the Midas name and to use Midas' Proprietary Marks in connection therewith.

Midas does control, to some extent, the public image of Filer's shop by requiring Filer to "keep his shop open to the public during all normal business days and hours" and "maintain interior and exterior painting and decor in such manner and form as may be reasonably prescribed from time to time by Midas." *Franchise Agreement*, at § 6.5(b) at 6. Midas does not, however, "exercise control over the operations of the franchisee to a substantial degree." 62B Am Jur.2d, *Private Franchise Contracts* § 492 at 408 (1990). In other words, there is no evidence that Midas controls the manner in which Filer performs the daily operations of its business, *i.e.*, it does not control the manner in which Filer hires and fires employees; trains and supervises employees; or performs services. Furthermore, the fact that Filer purchases and uses Midas products and utilizes the Midas System, does not, in and of itself, create an agency relationship, absent additional evidence of control. Moreover, plaintiffs do not allege that it was Midas' parts or the Midas System that was defective and caused Hall's brakes to malfunction. On the contrary, plaintiffs allege that the brake work on Hall's Honda Civic was never done, and the failure to repair the brakes was the proximate cause of the accident. *See Plaintiffs' Response to Defendant's Statements of Material Uncontested Facts*, at 2.

For the reasons stated, the Court concludes that there is no genuine issue of material fact with respect to whether an agency relationship exists between Midas and Filer. Therefore, Midas' motion for summary judgment will be granted.

**Outrage.**

 To establish a claim for outrage against Midas, plaintiffs must demonstrate the following four elements: (1) Midas intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) Midas' conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) Midas' actions were the cause of the plaintiffs' distress; and (4) the emotional distress sustained by plaintiffs "was so severe that no reasonable person could be expected to endure it." *McQuay v. Guntharp*, 331 Ark. 466, 470, 963 S.W.2d 583, 585 (1998) (internal quotation marks and

---

1. We note that the Third Circuit in *Drexel* held in that case that the issue of whether an agency agreement existed was a question of fact. To the extent that the Third Circuit's analysis in *Drexel* is inconsistent with the Court's holding in this case, we decline to follow its reasoning. *See also Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066–66 n. 6 (5th Cir.1995) (declining to follow the court's reasoning in *Drexel* ).

citation omitted). The type of conduct that meets the standard for the tort of outrage must be determined on a case-by-case basis. *Id.* The Arkansas courts gives a narrow view to the tort of outrage, and require clear-cut proof to establish the elements in outrage cases. *Id.*, 331 Ark. at 470–471, 963 S.W.2d at 585. Indeed, the courts have stated that "[m]erely describing the conduct as outrageous does not make it so." *Id.* (*citing Renfro v. Adkins*, 323 Ark. 288, 914 S.W.2d 306 (1996)).

In this case, the Court finds that the evidence falls far short of what is required under Arkansas law to prove a claim of outage. Therefore, Midas' motion for summary judgment on plaintiffs' outrage claim will be granted.

### Conclusion.

For the reasons stated, the court finds that Midas' motion for summary judgment on both of plaintiffs' claims for relief should be granted. A separate order shall be entered concurrently herewith.