CROSSETT HEALTH CENTER v. CROSWELL.

4-9989                                                256 S. W. 2d 548

Opinion delivered March 30, 1953.

Rehearing denied April 27, 1953.

---

*Leffel Gentry,* for appellant.

*A. James Linder* and *Switzer & Switzer,* for appellee.

GRIFFIN SMITH, Chief Justice. Appellee as a patient at Crossett Health Center was operated upon July 6, 1948. Intestinal adhesions and other ailments were encountered. Steel wire was used in closing the operational wound. Discomfort resulted to such an extent that an effort was made to remove the wire. Pain and general debility continued. The Health Center treatment was unsatisfactory and in consequence of what the patient said was a refusal of the Center to further coöperate she went to Louisiana. At Bastrop Dr. J. N. Jones operated. He removed a small piece of the suture wire from an intestine, but testified that it had not fully penetrated, hence serious infection such as peritonitis had not developed. It was Dr. Jones' belief that the persistent pain experienced by the patient could have been caused by the wire, and very probably was.

Mrs. Croswell sued for $130,885.85—thirty thousand for pain and suffering, $50,000 because as a result of the mistreatment she became a drug addict, $50,000 to

compensate humiliation because of arrest by federal narcotic agents, conviction, and a three-year suspended sentence, and $885.85 for medical and hospital expenses. From a judgment for $1,885.85 the Health Center has appealed.

The operation for removal of wire occurred August 8, 1948. The original complaint was filed April 30, 1951, and in order to avoid application of the two-year statute of limitations raised by demurrer, an amendment was filed July 7, 1951, alleging that the faulty work had been concealed.

Dr. W. R. Cothern, who assisted the director-surgeon with the operation, was named as a co-defendant, but the jury found in his favor. It is insisted on appeal (1) that the court erred in not sustaining the defendant's demurrer, which was renewed after the amendment was filed, and (2) the Health Center is a benevolent and charitable association and is not answerable for the torts of its agents.

*First—The Statute of Limitation.*—Act 58 of 1945, Ark. Stat's, § 37-205, reads: "All actions of contract or tort for malpractice, error, mistake, or failure to treat or cure, against physicians, surgeons, dentists, hospitals, and sanataria, shall be commenced within two years after the cause of action accrues. The date of the accrual of the cause of action shall be date of the wrongful act complained of, and no other time".

We have said in effect that fraudulent concealment will toll the statute, although the case in which the language was used held that the action was barred. See *Steele* v. *Gann,* 197 Ark. 480, 143 S. W. 2d 520, 120 A. L. R. 754, decided under Act 135 of 1935, which allowed three years.

Admittedly the operation in the case at bar was performed more than two years before suit, hence the demurrer should have been sustained unless conduct amounting to fraudulent concealment prevented appellee, as a reasonable person, from knowing that some of her

continuing ills were traceable to appellant's failure to remove the wire.

The Act of 1935 fixed the time of accrual of the cause of action as "the date of the wrongful act complained of *and no other time*". Regardless of this language, construction given the Act in the Steele-Gann case recognizes an exception where fraudulent concealment has prevented the injured person from seeking redress. The identical sentence found in Act 135 of 1935 is in the enactment of 1945.

Dr. Cothern testified that the last time he saw Mrs. Croswell was March 21, 1949. At that time the following indorsement was made: "Pain in the abdomen; temperature 99; abdomen distended, but is soft with no definite areas of tenderness". This date substantially coincides with statements by Mrs. Croswell that she was refused readmittance to the Health Center; and, inferentially, this refusal continued until other physicians were consulted.

A comparatively modern case (1931) dealing with fraudulent concealment is *Schmucking* v. *Mayo,* 183 Minn. 37, 235 N. W. 633. There, as here, a demurrer was overruled and the defendant appealed. The gist of the opinion is that when, through fraudulent concealment by the tort-feasor, a party against whom a cause of action exists prevents the person alleging injury from obtaining knowledge thereof, the statute of limitation will commence to run only from the time the cause of action is discovered or might have been discovered by the exercise of diligence. "This," says the opinion of Chief Justice WILSON, "is the rule apart from any statute."

To the same effect is *Johnson* v. *Nolan,* 105 Calif. App. 293, 288 Pac. 78, and other cases cited in 74 A. L. R. 1317. See, also, 144 A. L. R. 209, 151 A. L. R. 1035.

*Burton* v. *Tribble,* 189 Ark. 58, 70 S. W. 2d 503, is to the point. There an abdominal operation was performed and the surgeon negligently left a ball of gauze within the cavity. In holding that an action brought

seven years later was not barred as a matter of law, it was said:

". . . Appellee's acts of leaving the ball of gauze in appellant's abdominal cavity and his failure to apprise appellant thereof were such fraudulent concealments and continuing acts of negligence as toll the statute of limitation until appellee performed his duty of removing the foreign substance or appellant learned or should have learned of its presence."

The opinion also called attention to the fact that by its demurrer the appellee had admitted negligence. In the case at bar an answer was filed after the demurrer to the amended complaint had been overruled, hence the cause was tried on its merits rather than upon admissions of the demurrer.

Our conclusion is that there was sufficient evidence of appellant's failure to exercise appropriate diligence to ascertain why the patient's suffering continued, therefore the issues were properly presented to the jury. That the wire could have been found is attested by the fact that Dr. Jones discovered it without unusual difficulty, and it is fairly inferable that its existence would have been disclosed by X-ray.

*Second—Claim of Immunity as an Institution of Charity.*—We have held that agencies, trusts, etc., created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *Woman's Christian National Library Association* v. *Fordyce,* 79 Ark. 532, 86 S. W. 417, and *Fordyce* v. *Woman's Christian National Library Association,* 79 Ark. 550, 96 S. W. 155, 7 L. R. A., N. S. 485. The last case was distinguished in *Morris* v. *Nowlin Lumber Co.,* 100 Ark. 253, 140 S. W. 1. The Library Association permitted a judgment to go against it on a claim predicated upon negligence of its trustees. The decision, written by Special Judge U. M. Rose, is that the Association's property could not be sold under the execution for the nonfeasance,

misfeasance, or malfeasance of its agents or trustees. A public charity is a public trust, "and is bound to apply its funds in furtherance of the charity, and not otherwise. . . . To give damages out of a trust fund would not be to apply it to those objects which the author of the fund had in view, but would be to divert it to a completely different purpose." 79 Ark. 550, 96 S. W. 160.

In *Arkansas Midland Railroad Co.* v. *Pearson,* 98 Ark. 399, 135 S. W. 917, 34 L. R. A., N. S. 317, we held for the appellant railroad company on the proposition that where it gratuitously assumed to collect and preserve a fund deducted from the salaries and wages of its employees and to provide hospital accommodations and medical attention for its injured personnel, without any profit or gain, such company would not be responsible for the negligence of physicians and surgeons employed at the hospital, provided it used ordinary care in their selection. On the other hand, it was stated that the railroad company was not conducting a charity, "for only those employes who had contributed the fees deducted from their wages for its maintenance were entitled to enter there for treatment, [and] . . . certainly the railroad company that assumed gratuitously to collect and preserve such funds and provide hospital accommodations and competent physicians and surgeons to operate it, without any profit or gain or hope thereof therefrom, should not be required to pay damages for such negligence or malpractice, it being no part of its business under its charter to maintain a hospital. At most it can only be considered a trustee for the proper administration and expenditure of such fund, and should be held only to ordinary care in the selection of competent and skillful physicians to administer relief and provide attention to sick and injured employees".

Crossett Health Center was created under authority of §§ 2252 to 2259 of Pope's Digest, now §§ 64-1301, *et seq.,* Ark. Stat's. The preamble to its articles of incorporation expresses interest of Crossett Lumber Company in the hospital and health facilities of Crossett and Ashley

county and the surrounding territory. The lumber company was willing to make substantial contributions toward the realization of these ends, having indicated that with the organization of a benevolent agency devoted to such objects it would donate lands for a hospital site and give to the organization "the present furnishings of its privately owned hospital in Crossett, together with a sum of money". It was "particularly provided" that the incorporated association should have and exercise the powers conferred by §§ 6 and 7 of the Act of February 3, 1875. These sections, copied here in a single paragraph, are: "Any such corporation shall have power to raise money in any manner agreed upon in its constitution or articles of association. . . . Such corporation shall have such powers of suing and being sued, buying, holding and selling property, real and personal, and of otherwise carrying out the purposes and objects of their organization as are possessed by other corporations and which may be necessary to their efficient management and the promotion of their purposes".

Judge Rose, at page 566 of the Arkansas Reports, (v-79) commented on the statutory authority for suit, drawing a distinction between the right to sue and the power to execute in satisfaction of the judgment.

The concluding sentence in § 2 of Art. 1 of the Charter is: "This Foundation and its hospital and other property shall not be operated for profit and no part of such net earnings as it may have shall ever inure to the benefit of any member, individual, partnership, association, or corporation".

Members originally named were E. C. Crossett, J. W. Watzek, Jr., and A. R. Watzek, "and those to whom they may assign said memberships; and in case of death of any member his or her membership shall pass to a person to be selected and designated by the remaining member or members". Assignment of membership is forbidden unless the assignee shall be approved "by the vote of the two other members". By supplemental proceedings January 23, 1951, § 1 of Art. 3 was amended.

In its original form the governing body, as distinguished from members or memberships, consisted of not less than five nor more than seven persons, including the three individuals currently holding membership in the Foundation. The amendment authorized a governing body of not less than seven nor more than fifteen, including the three members.

Article 4 relates to operation of the Foundation and is copied in the margin.[1]

Cases from other jurisdictions are divided respecting immunity of charitable and benevolent organizations from execution, the theory of those holding against execution being that the property is dedicated to a particular purpose and is therefore held in trust. In the Fordyce-Library Association case attention was called to four divergent theories announced by courts relative to liability: (1) Cases holding that the property of a charity can not be sold under execution; (2) cases construing charities unfavorably and assimilating them to private corporations organized for profit; (3) cases holding that trustees of a charity, though not answerable for the negligence of its agents, are liable for want of ordinary care in their selection of servants or employes, and (4) cases holding that on a judgment against a charitable organization the grounds and building of the defendant can not be sold under execution, but that any

---

[1] Art. IV, § 1. The Board of Governors shall adopt and from time to time revise rules and regulations in the matter of the conduct of the affairs of this Foundation and for admission to and the use of the facilities and services which it will offer in and through its hospital and/or other facilities, and shall adopt, and from time to time revise, a plan of operation providing for dues, fees, or assessment-paying subscribers and their rights as such subscribers and shall adopt and from time to time revise schedules of charges for services that it may render to such subscribers to its plan. It may also adopt and from time to time revise rules and regulations and schedule of charges for services it may render to non-subscribers to its plan and it may make arrangements for such of these as are unable to pay full charges. It may provide for the employment of or contract with doctors, nurses, attendants, and such other employees as in the judgment of the Board of Governors may be deemed necessary, meet and proper. The Board of Directors shall have full and unlimited authority to carry out the objects and purposes of this Foundation and to exercise any and all powers vested in this corporation in the establishment, construction, maintenance, and operation of said hospital and related and connected facilities.

of its unappropriated funds may be applied to the satisfaction of a judgment.

Court decisions rendered since 1906 vary somewhat in the application of reasoning, but generally the differences pointed to by Judge Rose are the fundamental distinctions.

*Arkansas Baptist College* v. *Wilson*, 200 Ark. 1189, 138 S. W. 2d 376, was decided in 1940 under the Act of 1935. It was held that where the articles of association of a college conferred power upon trustees to acquire property, sue and be sued, and contract in the corporation's name, its personal property could be sold in satisfaction of a judgment on contract. By way of dictum the opinion says: "If this were an action to recover for the tort of the trustees, then appellants would be protected under the doctrine of *Fordyce* v. *Woman's Christian National Association*".

A review of all of the cases dealing with liability of a benevolent medical center for the torts of its agents would serve little purpose; nor does space permit us to summarize the so-called leading cases. In Arkansas we are committed to the rule that an organization maintained exclusively for charitable purposes will be protected against execution, in contradiction of the doctrine *respondeat superior*.

But the question arises, Is every organization that is created by proceedings appropriate to bring it, prima facie, within the purview of a benevolent entity for incorporation purposes a charitable institution in fact, intended for the public good to the exclusion of private interests, however meritorious such private ends may be?

In the case at bar appellee paid approximately $500 for the operation and hospitalization incidental to the transaction complained of, and more than $800 for the Louisiana operation and treatment. She was an employee of Crossett Paper Mill. The court sustained an objection to Mrs. Croswell's testimony regarding payments to the Health Center on the ground that the complaint did not ask recovery of that sum. We think, how-

ever, that the answer was competent on questions touching her status as a paying or charitable patient, inasmuch as a defense involves factual considerations.

Article 6 of the charter relates to dissolution or liquidation of the corporation. In that event the assets remaining after debts have been paid ". . . shall be distributed by the board of governors in any manner consistent with the laws of Arkansas".

The right to amend the articles of incorporation is reserved to members of the Foundation—the three incorporators.

Our conclusion is that the plan of organization—an admirable one in the circumstances and commendable from the standpoint of those who promoted the project—falls somewhat short of purely benevolent and charitable purposes essential to clothe its property with trust attributes. Crossett Lumber Company and the paper mill are enormous projects tremendously beneficial to the state. These vast operations necessarily require the employment of hundreds of men and women who are subject to the ordinary risks of industrial operations such as are carried on. If, like the library association in the Fordyce case, membership were required, thereby eliminating commercialized transactions; or if, like Pearson, against whom dues were assessed by Midland Railway for administration in trust,—in any case where the purpose is disassociated from considerations gainful to the promoters in point of convenience, operation, and employer-employee relationship, and where the original capital and earnings are dedicated to benevolence,—in such circumstances we would say that the trust assets cannot be diminished by execution.

But in the case at bar there are factors sufficient for the jury to find that the Medical Center was not a trust involving dedication of its property to the public. It is significant, however, that no instructions were requested by the defendant touching this issue. On the other hand Instruction No. 11 given at the defendant's request discloses the Center's theory: "Even though

you may find that the surgeon or the assistant surgeon failed to exercise the care required of either of them in the performance of either of the operations upon the plaintiff and that this caused the loose wire to be in the plaintiff's abdomen, nevertheless the plaintiff's cause of action would be barred by the statute of limitations unless you find from a preponderance of the evidence that the surgeon or assistant surgeon discovered, or in the exercise of ordinary care should have discovered, the presence of the said wire in the plaintiff's abdomen''.

We think the factual issues were presented under correct instructions. Because we cannot agree with appellant that the cause was barred by limitation, or that evidence was sufficient to establish its immunity as a benevolent charity within the meaning of our statute and decisions, the judgment must be affirmed.

GEORGE ROSE SMITH, J., dissenting. I think the appellant's request for a directed verdict should have been granted, for the suit is barred by the statute of limitations. This is not a case in which the wrong to the plaintiff was fraudulently concealed, as there is no evidence that Dr. Cothern or any other agent of the hospital knew that a piece of wire had been left in the plaintiff's body. There could be no conscious concealment of a fact which was unknown to the defendants.

The court relies on *Burton* v. *Tribble,* where we held that, regardless of the physician's actual knowledge, he is under a duty to know whether a foreign object has been left in the wound, and on the basis of this imputed knowledge he is under a continuing duty to inform the patient of his carelessness. We distinguished a number of contrary holdings in other jurisdictions by pointing out that they were based on specific statutes requiring an action for malpractice to be brought within a certain period of time after the infliction of the injury. ''But,'' we said, (in 189 Ark. 58, 70 S. W. 2d 505) ''we have no such statute in this State.''

That case was decided in 1934. At the next session of the legislature Act 135 of 1935 was adopted. Both that

Act and the present law provide: "The time of the accrual of the cause of action shall be date of the wrongful act complained of and no other time." In view of the specific language in the *Burton* case, which was undoubtedly known to the General Assembly, it is perfectly plain that the legislative intent was to change the rule of that case by supplying the omission that we had mentioned. There being no fraudulent concealment on the part of the appellant, it is our duty to give effect to the plain terms of the statute, however much we may doubt its wisdom. Holding this view, I express no opinion on the second point covered by the majority.

HOLT, J., joins in this dissent.