Gina GEORGE *v.* JEFFERSON HOSPITAL ASSOCIATION, INC., d/b/a Jefferson Regional Medical Center, and St. Paul Fire & Marine Insurance Company

98-1134                                             987 S.W.2d 710

Supreme Court of Arkansas
Opinion delivered April 8, 1999
[Petition for rehearing denied May 13, 1999.*]

---

*Morgan Welch & Associates*, by: *Morgan E. Welch*, for appellant.

*Bridges, Young, Matthews & Drake PLC*, by: *Stephen A. Matthews*, for appellees.

L AVENSKI R. SMITH, Justice. This is a medical malpractice action. Appellant, Gina George, appeals grants of

summary judgment by the Grant County Circuit Court in favor of appellees, Jefferson Hospital Association, Inc. (JRMC), and St. Paul Fire & Marine Insurance Company (St. Paul), its insurance carrier. The trial court ruled that the doctrine of charitable immunity entitled JRMC to summary judgment and that the statute of limitations on medical malpractice actions entitled St. Paul to summary judgment as well. We agree and affirm. This case was certified to this Court on March 3, 1999, pursuant to Arkansas Supreme Court Rule 1-2(g).

On or about September 3, 1994, appellant, while hospitalized at JRMC for caesarean section, received the drug Parlodel as prescribed by her physician, Dr. Reid G. Pierce, to prevent production of breast milk. JRMC discharged appellant on September 4, 1994. She continued taking the medication as prescribed. The next day, September 5, 1994, after experiencing what seemed like seizures, George was readmitted to the hospital. She alleges this resulted in serious physical harm. She contends that the symptoms directly resulted from the medication Parlodel. She also contends that the negligence of the physician, hospital, and drug manufacturer caused her injury. Apparently, the medication had been withdrawn from the market in mid-August 1994, but notice of the recall had not been given by the manufacturer, Sandoz Pharmaceutical Corporation (Sandoz), to doctors and hospitals, including the defendants in this action, prior to its prescription by Dr. Pierce to appellant.

On August 29, 1996, appellant filed her complaint against JRMC, Dr. Pierce, and Sandoz. Appellee, St. Paul, provided appellee, JRMC, a defense pursuant to a policy of insurance JRMC had purchased. In February of 1997, appellee moved for summary judgment on the basis of the doctrine of charitable immunity. Appellant contended that genuine fact issues existed which would make summary judgment inappropriate. Appellant relied on expert witnesses' interpretation of data about JRMC's structure and operation obtained during discovery. George asserted that a trial was necessary to determine whether JRMC sufficiently met the requirements of a charitable organization in order to raise the shield of immunity. Appellant engaged in extensive discovery to obtain facts relative to JRMC's asserted

charitable status. The trial court reviewed the pleadings, affidavits, and arguments of the parties and ruled on June 27, 1998, that although some issues of fact might remain, summary judgment was still appropriate because reasonable minds could not differ as to the charitable status of JRMC.

The court also granted summary judgment to JRMC's insurer, St. Paul's Fire and Marine Insurance Company, on June 12, 1998. The court did so on the basis of the two-year statute of limitations on medical malpractice actions.[1] Appellant filed her claim against JRMC within two years of her injury. However, she did not file a claim against the insurer directly until January 26, 1998, when she amended her complaint against JRMC. Appellant contends the court erred in granting summary judgment because its claim against St. Paul should be considered to have been filed as of August 29, 1996, under the relation-back provision of Ark. R. Civ. P. 15(c).

*Standard of Review*

■ ■ The law is well settled that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.; Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998). Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997); *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998). After reviewing

---

[1] Ark. Code Ann. § 16-114-203.

undisputed facts, summary judgment should be denied if under the evidence reasonable men might reach different conclusions from the undisputed facts. *See, Leigh Winham, Inc. v. Reynolds Ins. Agency*, 279 Ark. 317, 651 S.W.2d 74 (1983).

*Charitable Immunity*

■ ■ The doctrine of charitable immunity has over a ninety-year history in Arkansas jurisprudence. *Grissom v. Hill*, 17 Ark. 483 (1856); *Hot Springs School District v. Sisters of Mercy*, 84 Ark. 497 (1907). The essence of the doctrine is that agencies, trusts, etc., created and maintained exclusively for charity may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *Crossett Health Center v. Croswell*, 221 Ark. 874, 256 S.W.2d 548 (1953). Through the years we have examined the doctrine in detail, finding it applicable to some entities claiming charitable-entity status and inapplicable to others.[2] The doctrine obviously favors charities and results in a limitation of potentially responsible persons whom an injured party may sue. We, therefore, give the doctrine a very narrow construction. *Williams v. Jefferson Hospital Association, Inc.*, 246 Ark. 1231, 442 S.W.2d 243 (1969). But applying it narrowly does not mean that we will avoid its use in any appropriate circumstance.

■ In a recent case considering charitable immunity, we adopted eight factors for courts to review to aid in determining

---

[2] The following are cases in which this court held charitable immunity applicable: *Fordyce v. Woman's Christian National Library Association*, 79 Ark. 550 (1906); *Hot Springs School District v. Sisters of Mercy*, 84 Ark. 497 (1907); *Cabbiness v. City of North Little Rock*, 228 Ark. 356, 307 S.W. 2d 529 (1957); *Helton v. Sisters of Mercy of St. Joseph's Hospital*, 234 Ark. 76, 351 S.W. 2d 129 (1961); *Williams v. Jefferson Hospital Association, Inc.* 246 Ark. 1231, 442 S.W. 2d 243 (1969); *LeMay v. Trinity Lutheran Church*, 248 Ark. 119, 450 S.W. 2d 297 (1970).

The following are cases in which this court held charitable immunity inapplicable: *Crossett Health Center v. Croswell*, 221 Ark. 874, 256 S.W. 2d 548 (1953); *J.W. Resort, Inc. v. First American National Bank*, 3 Ark. App. 290, 625 S.W. 2d 557 (1981); *Masterson v. Stambuck*, 321 Ark. 391, 902 S.W. 2d 803 (1995); *Ouachita Wilderness Institute v. Mergen*, 329 Ark. 405, 947 S.W. 2d 780 (1997).

whether charitable immunity applies to a given set of facts.[3] *Masterson v. Stambuck*, 321 Ark. 391, 902 S.W.2d 803 (1995). These factors are illustrative, not exhaustive, and no single factor is dispositive of charitable status. *Ouachita Wilderness Inst. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997). These factors include: (1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation. *Masterson, supra*, at 401.

Of the eight factors listed above, three are clearly established based upon evidence in the record. Those three are 1, 2, and 7. The first and second are perhaps the easiest of the factors to demonstrate as they are merely a matter of possessing corporate documentation reflecting nonprofit and charitable character. This, JRMC has done. Appellant does not even contest the existence of these qualities.

■ JRMC satisfies the seventh factor as it does provide services free of charge to those who cannot pay. JRMC's response to Plaintiff's Interrogatory 48 asserts its services are available to those who are not pecuniarily able. Patient resources are evaluated, and those whose income falls below the federal poverty line and who have limited assets can have their bills written off. Appellant counters that JRMC only established clear guidelines for charitable cases since 1996. However, there is nothing which indicates the program did not exist prior to this more definitive formalization. As to the fourth, fifth, and eighth, appellant contends that these are all questions of fact and must therefore be tried rather than resolved on summary judgment. We disagree. While there may be fact issues involved, they are not matters of disputed

---

[3] These factors were adopted from those stated in a Virginia federal court case. *Davidson v. Colonial Williamsburg Foundation*, 817 F. Supp. 611, 614 (E.D. Va. 1993).

fact. Rather, they are differing legal interpretations of undisputed facts. In such cases, an appellate court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undisputed facts. *Leigh Winham, Inc. v. Reynolds Ins. Agency*, 279 Ark. 317, 651 S.W.2d 74 (1983). When each of the remaining *Masterson* factors are analyzed with the relevant undisputed facts, JRMC's charitable status is established.

■ Factors three and four inquire whether the hospital seeks to "break even or earn a profit." It is undisputed that JRMC does not try to strictly break even, but, in fact, does seek to have some "surplus" or "profit." However, trying to break even is only one factor and certainly not a dispositive one when applied to a hospital. Modern hospitals are complex and expensive, techno-logical, economic and medical enterprises that can ill afford to come short of even in their financial integrity. Running a small surplus should not be seen as totally incompatible with charitable status in such cases. It is undisputed that JRMC's surplus or profit was in the range of 4% to 5%, far below that of for-profit hospitals which typically seek profit margins in the 15% to 20% range. The existence of profit is not determinative of charitable status. In 1961, a $600,000 surplus did not destroy a hospital's charitable status where the funds anticipated use was to expand and improve its facilities. *Helton, supra* at 79.

■ The fifth factor examines what an entity that does pro-duce a surplus actually does with it. Does it inure to the benefit of individuals, or is it returned to the enterprise to further its charita-ble purposes? Based upon the undisputed facts in the record, we hold that JRMC's use of its surplus is consistent with and in fur-therance of its overall charitable purposes. JRMC has ownership interests in for-profit entities including a long-term facility (Davis Life Care); a collection agency and physician management com-pany (Jefferson Management Services); a corporation that man-ages office space that it sells and leases (Jefferson Regional Medical Center Development); and diagnostic imaging services (Jefferson Health Affiliates). These entities, with one exception, are owned entirely by JRMC, and all profits or dividends are used in further-ance of the hospital's asserted purpose, *i.e.*, to provide health care

to all who need it. We recognized as far back as 1906 that a charitable hospital could charge for its services so long as the money thus received is devoted altogether to the charitable object which the institution is intended to further. *Hot Springs School District, supra,* at 500.

■ Factor six asks whether the entity is dependent upon donations and contributions for its existence. The undisputed fact in the instant case is that JRMC does not depend for its existence exclusively on donations. Its financial obligations met by donation is in the range of 6%. However, as previously stated, a modern hospital, with rare exception, would find it extremely difficult to operate wholly or predominately on charitable donations. While we recognize that if JRMC did so operate this would be an even clearer case of charitable immunity, its financial and organizational structure as presented do not negate its overriding charitable purpose.

■ The final factor concerns compensation to directors and officers. It is an undisputed fact that JRMC's chief executive officer and chief financial officer are compensated at $225,000 and $170,000 per year respectively for their services. They also can receive bonuses based in part upon surplus achieved. Yet, it is not necessary for charitable organizations to have entirely volunteer staff and management. JRMC's size and complexity make knowledgeable, well-qualified personnel essential. Such persons do not readily volunteer their services or serve at rates of compensation markedly lower than market rates. In the case of JRMC, we hold that minimal bonus compensation to officers and directors does not put the hospital in the position of being maintained for the private gain, profit, or advantage of its organizers.

■ Based upon a review of the totality of relevant facts and circumstances, we hold that JRMC meets the requirements of a charitable entity for purposes of asserting the defense of the charitable-immunity doctrine. We also hold that fair-minded persons presented with the same facts would reach the same conclusion. Permitting hospitals such as JRMC to raise this defense may seem harsh to injured parties, but our laws provide a remedy in

such cases whereby the entity's insurance carrier may be sued directly. Ark. Code Ann. § 23-79-210.

## Statute of Limitation

In the instant case, appellant filed such a direct action against JRMC's carrier, St. Paul. Unfortunately, it did so by amending its complaint against JRMC in January of 1998. The original complaint was filed in August 1996, just within the applicable statute of limitations. The only means by which appellant's claim against St. Paul could avoid being time-barred would be if it related back to August 1996, as an amendment to its August 1996 complaint under the provisions of Ark. R. Civ. P. 15(c). The trial court ruled that it did not and granted summary judgment to St. Paul on June 8, 1998, following a May 26, 1998 hearing. We agree with the trial court and affirm.

Rule 15(c) [AMENDED AND SUPPLEMENTAL PLEADINGS] provides:

> (c) *Relation Back of Amendments*: An amendment of a pleading relates back to the date of the original pleading when:
>
> (1) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (2) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (1) is satisfied and, within the period provided by Rule 4(i) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and *(B) knew or should have known that, but for a mistake concerning the identity of the proper party*, the action would have been brought against the party.

(Emphasis added.)

In order for appellant to avail herself of Rule 15(c)'s relation-back provision, the facts must show four things: (1) that the claim must have arisen out of the conduct set forth in the original pleading; (2) St. Paul must have received such notice of the institution

of the action that it would not be prejudiced in maintaining defense on the merits; (3) St. Paul must have known, or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against it; and (4) the second and third requirements must have been filled within 120 days from August 29, 1996, when the original complaint was filed.

Appellant meets the first and second requirements easily as the events leading to the claim are identical. Additionally, St. Paul had notice of the action from its inception and indeed has provided JRMC's defense so no prejudice would result from its becoming a party. However, the inquiry does not end there. George must also establish that St. Paul knew that George's omission of it from the complaint was a mistake of identity as to the proper party. This, appellant has not done. From the facts presented to the trial court and the arguments before this court, it is apparent that the mistake of appellant was not as to St. Paul's identity but in its decision to not file immediately against the insurer as well as the hospital. Appellant does not contend she did not have the correct identity for the insurance company. Appellant argues instead that she believed suing St. Paul prior to judicial determination of its charitable status was legally perilous. Appellant believed it could have resulted in the dismissal of both actions in a kind of legal "catch-22." This argument is meritless. Appellant could have sued both initially and through alternative pleading not have jeopardized her claim against either the hospital or its insurer. This court's decision in *Harvill v. Community Methodist Hosp. Assn.*, 302 Ark. 39, 786 S.W.2d 577 (1990), is dispositive of this issue. There, as here, appellant sought relation back under Rule 15(c) contending a mistake of identity had occurred. The court construed the meaning of "mistake concerning identity" relying on federal cases construing the similar federal provision.[4] This court held that what the appellant contended was a mistake of identity was really a conscious and deliberate strategical decision. *Id.* at 43. In the instant case, St. Paul had no reason to

---

[4] *Trace X Chemical v. Gulf Oil Chemical Co.*, 724 F.2d 68 (8th Cir. 1983); *Russ v. Ratliff*, 578 F.2d, 221 (8th Cir. 1978).

believe that George was mistaken as to its identity as JRMC's insurance company. It could only presume that appellant's litigation decision not to sue it was a purposeful calculation, mistaken perhaps, as to its consequence but not as to its choice of parties. The trial court's decision is accordingly affirmed.

Affirmed.

BROWN, J., dissents.

ROBERT L. BROWN, Justice, dissenting. In 1996, Jefferson Hospital Association, Inc., d/b/a Jefferson Regional Medical Center ("JRMC"), had a positive five-year surplus in excess of $5 million. It paid its chief executive officer a quarter of a million dollars in salary plus a bonus based on job performance. It owned outright or invested in several for-profit businesses, including a collection agency and management agency for physicians known as Jefferson Management Services, a managed care organization known as Arkansas Preferred Provider Organization, a diagnostic imaging center named Jefferson Health Affiliates, and a business for selling, leasing, and managing office space for physicians named Jefferson Regional Medical Development. It carried liability insurance for potential medical malpractice with St. Paul Fire & Marine Insurance Company. It did not have established guidelines for free care until two years after the negligence alleged by Gina George occurred. Based on the above, JRMC failed to satisfy several of the eight factors relied upon by the majority to determine charitable immunity. At the very least, there were fact questions raised by Gina George's economist, Dr. Charles Venus, who filed an affidavit in this case in opposition to summary judgment. He questioned the amount of profit earned by JRMC and charitable care offered, both of which go to the very heart of whether charitable immunity should be afforded.

We are one of a distinct minority of states that still cling to the defense of charitable immunity, even though the original justification for charitable immunity — protection of funds given to the charity from judgments — has long since become outmoded. See RESTATEMENT OF TORTS SECOND § 895E, p. 420; "The Quality of Mercy: 'Charitable Torts' and their Continuing Immunity." 100 HARVARD LAW REVIEW 1382 (1987). In retaining

the defense, we have made it clear, as the majority states, that we will give the doctrine a very narrow construction. *See Williams v. Jefferson Hospital Association, Inc.*, 246 Ark. 1231, 442 S.W.2d 243 (1969).

The majority, however, does not follow its own admonishment and instead gives the charitable-immunity defense in this case a very broad application. It concludes that there are no factual issues raised in a case fraught with factual questions, including what is the extent of the profit realized by JRMC and what is the extent of its charitable care? A corollary fact question is whether JRMC provides that write-offs for the difference between Medicaid benefits and the actual cost of care and write-offs for bad debt qualify as charity? Does the investment of JRMC in its for-profit subsidiaries affect its charitable status? What about the fact that 94% of its revenue comes from patient pay with only 5% or 6% derived from public or private gifts?

When there are factual issues involved in a charitable immunity defense, this court has held that the matter is for the jury to resolve. *See Crossett Health Center v. Croswell*, 221 Ark. 874, 256 S.W.2d 548 (1953). In *Croswell*, the Crossett Health Center was sued because one of its doctors allegedly left a small piece of suture wire in the plaintiff's intestine. We concluded: "But in the case at bar there are factors sufficient for the jury to find that the medical center was not a trust involving dedication of its property to the public." 221 Ark. at 883, 256 S.W.2d at 552. The relevant factors for determining charitable immunity may have changed since *Croswell*, but when factual issues are entwined within the pertinent factors, the jury should decide the matter.

The majority appears to decide the issue based on the fact that JRMC issues no capital stock and pays no dividends. But what about bonuses to its officers for job performance? That certainly is profit or gain to its principals of a different sort. Moreover, if issuing capital stock and paying dividends decide the issue, why have the other factors to consider?

I would reverse the summary judgment and remand for trial.