Homer Otis DRAPER and Colleen Draper *v.*
CONAGRA FOODS, INC.

CA 05-25 212 S.W.3d 61

Court of Appeals of Arkansas
Opinion delivered September 7, 2005

*Jerrie Grady* and *Blair & Stroud*, by: *H. David Blair*, for appellants.

*Cross, Gunter, Witherspoon & Galchus, P.A.*, by: *David B. Vandergriff* and *Brian A. Vandiver*, for appellee.

WENDELL L. GRIFFEN, Judge. In this negligence action, appellants Homer and Colleen Draper appeal from an order granting summary judgment to appellee ConAgra Foods, Inc. They argue that the circuit court erred in ruling that, as a matter of law, the driver of the truck involved in the motor-vehicle accident in this case was not an agent or employee of appellee. Because a genuine issue of material fact remained regarding whether the driver of the truck had an employer-employee relationship with appellee, we reverse and remand for trial on the merits.

According to appellants' complaint filed August 4, 2003, appellant Homer Draper was driving west on Arkansas State Highway 58 when he collided with a truck and trailer driven by Charlie Garrett. The complaint alleged that Garrett was turning east onto Highway 58 but pulled onto the highway too soon, causing the collision. Appellant Homer Draper sought damages for his injuries, while appellant Colleen Draper sought damages for loss of consortium. Garrett was employed by Patterson-Salter

Trucking, Inc. (hereinafter "PST"), which had been hired by appellee to transport chickens to its facilities.[1]

On June 18, 2004, appellee filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law because PST was not its agent or employee. Appellee presented Garrett's deposition testimony as well as the deposition testimony of PST's owners, Jack Patterson and Lloyd Salter.

Patterson testified that PST had a hauling agreement with appellee from 1976 to June 1, 2003. The relevant portions of the contract read:

> 1) ConAgra has contracted with Independent Contractors to haul live chickens from broiler houses at certain farms in the State of Arkansas and deliver the live chickens to processing plants in Batesville and Clinton, Arkansas.
>
> 2) ConAgra agrees to pay Independent Contractor for chickens hauled and delivered to processing plant a base payment per load of $190.00 with adjustment factors for round trip distance to farms and diesel fuel prices as detailed herein. . . .
>
> * * *
>
> 5) Independent Contractor shall be responsible only for the hauling and delivery of the live chickens.
>
> 6) Independent Contractor hereby agrees to idemnify [sic] and hold ConAgra harmless against all expenses, obligations or losses of any kind whatsoever for claims, debts, personal injuries or property damage arising out of the work to be performed by Independent Contractor for ConAgra.
>
> 7) Independent Contractor shall pay for his own expenses, taxes and fees in connection with performance of this contract, shall obtain and pay for any required permits or leases and shall comply with all applicable government laws and regulations.
>
> 8) Independent Contractor shall employ for his own account all labor necessary for the performance of this contract, shall furnish

---

[1] PST was also named as a defendant in this suit; however, it was voluntarily dismissed from this suit before the circuit court entered summary judgment in favor of appellee.

any and all equipment necessary to perform the contract, and shall be responsible for and assume all responsibility for any and all acts of the Independent Contractor or his employees.

9) Nothing contained herein should be construed as reserving or granting ConAgra any rights to exercise control over the method or manner in which Independent Contractor performs this contract, it being explicitly understood to use his best judgment in the method and manner of performing this contract to achieve the results specified.

10) Independent Contractor shall within one (1) day after execution hereof, but before the beginning work [sic], furnish to ConAgra proof of complete workers' compensation insurance coverage and general liability insurance with a reputable company authorized to do business in the State of Arkansas, with general liability limits to be not less than $300,000.

11) Although Independent Contractor is free to use his best judgement in performing the contract as specified in P. 9, he hereby agrees that he will perform the contract in such manner as to reduce to a minimum bruising of or death to the broilers.

12) Independent Contractor agrees to follow and abide by all sanitation and other disease prevention procedures applicable to personnel and equipment established by ConAgra.

13) It is understood by the parties that Independent Contractor shall haul and deliver to processing plants as above provided as many chickens and at specific times and dates as ConAgra may specify.

14) Either ConAgra or the Independent Contractor may terminate this contract at any time for any reason by mailing or delivering written notice of termination to the other at his or its usual place of business, such termination to be effective 30 days from the date of delivery of said notice.

Patterson testified that, while it was under contract with appellee, PST did not haul for anyone else other than a couple of loads. Salter would tell the drivers where to go, what time to go, how many chickens to load, and from where they were loading the chickens. PST did not load the chicken cages or catch the chickens. When the cages were loaded on the driver's truck, the driver would tie down the

chickens using PST equipment and drive the truck to the processing plant. After the driver weighed the truck at the plant, appellee's employees would drop the trailer and take it back to its shed. Patterson testified that he and Salter hired employees at different times and that no one other than he or Salter had authority to hire or fire employees. He also stated that PST paid unemployment taxes and withheld income tax, social security, and Medicare from the drivers' wages.

Patterson testified that the trucks had PST's name on them, per State requirements. There were also numbers on the trailer, which Patterson testified were mostly for appellee so that it could tell what trailer was coming in case it had to check the weight. Patterson also testified that appellee paid PST differently over the years. At first, appellee paid by the pound. By January 2003, appellee paid by the load. PST paid for gasoline and licensing fees. When asked about what supervisory role appellee played, Patterson testified that PST employees had little contact with appellee. Appellee did not tell PST what type of vehicles to purchase or what types of cages to buy. In bad weather, PST installed sheets and sideboards to protect the chickens, and this equipment was owned by PST. When talking about PST's status, Patterson opined that PST's drivers were independent contractors.

On cross-examination, Patterson testified that the chickens were originally transported in coops; however, appellee eventually told PST to haul the chickens in cages. Appellee also wanted the cages to meet its requirements. He noted that, on a typical week, Salter would receive a sheet from appellee specifying the number of loads, where the loads were to be picked up, and the time the loads were to be picked up. PST hauled Sunday through Thursday, and these times were specified by appellee. In scheduling, appellee would coordinate the specifications on the trip sheets with their production times at the processing facilities. This was because appellee did not want the chickens sitting on the truck for a long time. Patterson testified that PST had no discretion on whether to take the loads to appellee immediately or a few days later. He also noted that PST had no real discretion about what route to take to the chicken houses because there was usually only one sensible route to take.

Garrett testified that PST paid him $35 per load weekly; withheld taxes, social security, and Medicare; and gave him a W-2 form at the end of 2002. He never considered himself an employee of appellee. He stated that he received his orders from a mailbox in

the shed of appellee's facility. Salter did not dispatch drivers to particular loads unless changes were made. Garrett testified that, on a typical day, he would get a truck, fuel up, drive to appellee's facility, and pick up a trailer. The cages would be loaded on the trailer. He would then go to the farm, where chicken catchers would load the truck. He would then return to appellee's facility, drop off the trailer, get another trailer, and go again. Garrett stated that he would typically make three loads a day, five days a week. If there were multiple routes to a farm, he would select the route to take. He stated that, if a tractor or trailer needed to be repaired, either Salter or Salter's mechanic would fix it.

On cross-examination, Garrett testified that he would receive a trip sheet, indicating which drivers were assigned to which loads. He noted that when he would pick up his tractor, the trailers and cages would be at appellee's facility. Garrett testified that, in hot weather, appellee would tell him to put the chickens under a fan or a particular sprinkler system.

In his deposition, Salter testified that his job was to dispatch trucks and inspect the safety and condition of the trucks at appellee's facility. PST paid for repairs to trucks and to cages. He noted that, had PST refused to use the coops or cages appellee wanted them to use, appellee would have terminated the agreement. Salter never regarded his drivers as appellee's employees. On cross-examination, he noted that, if one of his drivers had a breakdown, the driver would be excused from making it to appellee's facility on time; otherwise, drivers were expected to be at the plant when appellee expected them. He also noted that the provisions of the contract regarding mileage adjustments, pay rate, and dead chickens were abandoned before 2003.

In response to appellee's summary judgment motion, appellants presented the deposition testimony of Jeffrey Vanemburg. Vanemburg testified that he started working for appellee in May 1997 as a live production manager and that he held the same position with Pilgrim's Pride, who purchased appellee's operations in Batesville. His duties included overseeing the hatcheries, feed mills, live-haul operations, and broiler chickens in the field.

Vanemburg testified that he worked for a "vertically integrated poultry company." He explained that the company grew its own eggs through its own hens in breeder houses. The company paid farmers for taking care of the hens and gathering the eggs.

After the farmers gathered the eggs, appellee's W-2 employees[2] transported the eggs to its hatchery. When the chicks were hatched, they were transported to a broiler house by W-2 employees. Once the chickens reached broiler size, drivers transported them to appellee's facilities, where the chickens were killed and processed. The chickens were loaded on the truck by catchers, who are contracted by appellee. Vanemburg testified that the catch times were based on a kill time at the plant. The schedules were designed so that the chickens would arrive thirty to forty-five minutes before when they would actually be needed. While the drivers were considered by appellee to be independent contractors, appellee would take issue if a driver took a four-hour coffee break. In 2003, only PST and Broadwater were hauling broilers for appellees. Vanemburg testified that, as of January 2003, appellee had no W-2 employees catching chickens or hauling them from the broiler houses to the processing facility. He noted that, other than changing from contract personnel to W-2 employees and using its own trucks and equipment, Pilgrim's Pride made no changes to the procedure of hauling chickens after it took over appellee's operations in Batesville.

After a hearing on the motion, the circuit court entered summary judgment in favor of appellees. The circuit court stated:

> I think everybody has said the facts are not really in dispute, it's what the facts mean that I guess is in dispute. I want to state what my understanding of the relationship between Patterson-Salter and ConAgra was. I understand that Patterson-Salter was in the trucking business, not in the chicken processing business. It owned and licensed its own rolling stock, providing fuel and maintenance, and hired and fired its own employees. It set and paid wages to the employees, provided workers' comp, and withheld and paid payroll taxes on those employees' wages. Apparently, its only client was ConAgra and at one point, it entered into a written contract with ConAgra for the provision of those services that stated that this was an independent contractor arrangement. ConAgra did not hire or train the drivers of Patterson-Salter trucking and apparently did not control some parts of the drivers' operations like securing the load or particular routes taken although the argument has been made, and probably is well stated, that in these rural areas there's not too

---

[2] "W-2 employees" is a term Vanemburg used to distinguish between company employees and independent contractors.

many ways to get to the plant without going a long way out of the
way so as a practical matter the routes were probably fairly well fixed
although I don't find anything that ConAgra required them to take
a particular route. ConAgra did have a right to terminate the
contract with Patterson–Salter and I think its contract called for 30
days notice but apparently it had no right to hire or fire particular
drivers. ConAgra did control the time and place of the pickup and
delivery of loads and my finding today is that that is necessary and
consistent with ConAgra's expectation of successful results of the
work of Patterson–Salter and its drivers. I'm finding as a matter of
law that the relationship between ConAgra and the individual
driver, in this case Charlie Vaughn Garrett, does not rise to the level
of agency, a master servant, or an employee relationship between
ConAgra and that driver, and the motion for summary judgment
must be granted.

For its sole point on review, appellants argue that the circuit
court erred in granting summary judgment in favor of appellee.
Summary judgment should be granted only when it is clear that
there are no genuine issues of material fact to be litigated and the
moving party is entitled to judgment as a matter of law. *O'Marra v.
Mackool*, 361 Ark. 32, 204 S.W.3d 49 (2005); *Riverdale Dev. Co. v.
Ruffin Bldg. Sys. Inc.*, 356 Ark. 90, 146 S.W.3d 852 (2004). The
burden of sustaining a motion for summary judgment is the
responsibility of the moving party. *O'Marra v. Mackool, supra; Pugh
v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). Once the moving
party has established a *prima facie* entitlement to summary judg-
ment, the nonmoving party must meet proof with proof and
demonstrate the existence of a material issue of fact. *O'Marra v.
Mackool, supra; Pugh v. Griggs, supra*. We determine if summary
judgment was appropriate based on whether the evidence pre-
sented by the moving party in support of its motion leaves a
material fact unanswered, viewing the evidence in the light most
favorable to the nonmoving party, resolving all doubts and infer-
ences against the moving party. *O'Marra v. Mackool, supra; George v.
Jefferson Hosp. Ass'n Inc.*, 337 Ark. 206, 987 S.W.2d 710 (1999);
*Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998). Our review
is not limited to the pleadings but also focuses on the affidavits and
other documents filed by the parties. *Hisaw v. State Farm Mut. Auto
Ins. Co.*, 353 Ark. 668, 122 S.W.3d 1 (2003); *Brown v. Wyatt*, 89
Ark. App. 306, 202 S.W.3d 555 (2005). After reviewing the
undisputed facts, we will reverse a grant of summary judgment if,

under the evidence, reasonable men might reach different conclusions from those undisputed facts. *Hisaw v. State Farm Mut. Auto Ins. Co.*, *supra*; *Brown v. Wyatt*, *supra*.

■ Appellants argue that the circuit court erred in ruling that PST was not an agent or employee of appellee. Specifically, they contend that a reasonable jury could draw an inference that PST was subject to a degree of control requisite for a finding of an employer-employee relationship. An independent contractor is one who contracts to do a job according to his own method and without being subject to the control of the other party, except as to the result of the work. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.*, 341 Ark. 317, 16 S.W.3d 545 (2000); *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 918 S.W.2d 178 (1996). One who employs an independent contractor is generally not liable for the torts of the contractor committed in the performance of the contracted work. *Stoltze v. Arkansas Valley Elec. Co-op. Corp.*, 354 Ark. 601, 127 S.W.3d 466 (2003); *Blankenship v. Overholt*, 301 Ark. 476, 786 S.W.2d 814 (1990). However, when the employer goes beyond certain limits in directing, supervising, or controlling the performance of the work, the relationship changes to that of employer-employee, and the employer is liable for the employee's torts. *Blankenship v. Overholt*, *supra*. Although the nature of an agency relationship is ordinarily a question of fact to be determined by the trier of fact, where the facts are undisputed and only one reasonable inference can be drawn from them, the nature of an agency relationship becomes a matter of law for the court to determine. *Howard v. Dallas Morning News, Inc.*, *supra*. Because there is no fixed formula for determining whether an entity is an employee or an independent contractor, the determination must be made based on the particular facts of each case. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.*, *supra*.

Our supreme court has adopted Restatement (Second) of Agency § 220(2) (1958) (hereinafter "Restatement § 220"), outlining several factors to consider when determining whether an employer-employee relationship exists between two parties:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not a business.

*See Aloha Pools & Spas, Inc. v. Employer's Ins. of Wausau*, 342 Ark. 398, 39 S.W.3d 440 (2000); *D.B. Griffen Warehouse, Inc. v. Sanders*, 336 Ark. 456, 986 S.W.2d 836 (1999). The right to control, not the actual control, is the principal factor in determining the worker's status:

> The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of performance, then the relation of master and servant necessarily follows. But if control of the means is lacking, and the employer does not undertake to direct the manner in which the employee shall work in the discharge of his duties, then the relation of independent contractor exists.

*Arkansas Transit Homes*, 341 Ark. at 321, 16 S.W.3d at 547 (quoting *Massey v. Poteau Trucking Co.*, 221 Ark. 589, 592, 254 S.W.2d 959, 961 (1953)).

Here, many of the Restatement factors favor a finding of an independent-contractor arrangement. PST owned the vehicles and other instrumentalities involved in the poultry hauling, and appellee paid PST by the load, not the hour. However, as appellants state often in their brief, these are not determinative of the

question. The parties dispute four of the remaining factors: the amount of control, the belief that the parties were creating an employer–employee relationship, whether PST was engaged in a distinct occupation or business, and whether or not poultry hauling was part of appellant's regular business.

### Control

In support of its argument that PST's drivers were independent contractors, appellee relies on the Independent Contractor Agreement and evidence of PST's control of the drivers. Appellee contends that PST's control of its own drivers was not diminished by the agreement to reduce bruising of or death to the birds or by the agreement to haul the birds at specific times and dates. In contrast, appellants argue that appellees controlled the route to be taken, the drivers, the protection of the poultry, and the specific times and dates of hauling.

1. Route to be taken. While appellee argues that the drivers controlled the route to be taken, appellants argue that the drivers could not exercise judgment in the route to be taken because, in most instances, there was only one route to the assigned the designation. The circuit court agreed with appellants' view regarding routes, and this view is supported by the evidence. If there was nothing to control, as appellants argue, then drivers' routes do nothing to support a finding of employer–employee status.

2. Control of the driver. Appellee argues that PST's drivers exercised their best judgment in driving. It further contends "There is no evidence that ConAgra instructed PST's drivers how to drive, how fast to drive, how or when to stop at stop signs, or give them any other similar driving instructions." Appellee argues that PST had control of its drivers, including control of payroll, payroll taxes, hirings, and firings. To the extent that appellee is arguing that it did not instruct PST's drivers to obey basic traffic laws, their argument is absurd, as an exercise of best judgment would include obeying all basic traffic laws. However, even if appellee makes this argument to imply no control whatsoever, such micro-management is not required for a fact finder to find that appellee had control sufficient to establish an employer–employee relationship.

3. Protection of Poultry. Appellee argues that PST's control was not diminished by its agreement to reduce bruising of or death to its birds. It contends, "An independent contractor can

agree 'to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal' " (citing Restatement § 220 cmt. e). The Independent Contractor Agreement instructed PST to "perform the contract in such manner as to reduce to a minimum bruising of or death to the broilers." However, appellee specifically instructed PST's drivers to take certain precautions in extremely hot or cold weather. Appellee also ordered PST to use certain containers when hauling the chickens. While the agreement dictated that PST's drivers would be able to use their best judgment, appellee instructed PST's drivers on how to transport the chickens. In addition, Salter testified that, had PST not used the coops or cages appellee wanted, appellee would have terminated the agreement. This degree of control is evidence supporting an inference of an employer-employee relationship.

4. Specific Time and Date Requirements. Finally, the parties dispute whether appellee exercised control when it gave PST's drivers specific date and time requirements. Appellees cite favorably to *Blankenship v. Overholt, supra:*

> [W]here the contractor is to produce a certain result, according to specific and definite contractual directions, agreed upon and made a part of the contract, and the duty of the contractor is to produce the net result by means and methods of his own choice, and the owner is not concerned with the physical conduct of either the contractor or his employees, then the contract does not create the relation of master and servant.

*Id.* at 479-80, 786 S.W.2d 816.[3] Paragraph 13 of the agreement between PST and appellee provides, "It is understood by the parties

---

[3] Appellee also notes the following in *Moore v. Phillips,* 197 Ark. 131, 140, 120 S.W.2d 722, 727 (1938):

> There are countless decisions of appellate courts construing stipulations in contracts, such as here involved, relating to the right of the owner "to give directions" — "orders" and "instructions" regarding the work as it progresses; and phrases such as "in accordance with instructions" — "as directed" — "In such manner as shall be directed" — "under supervision of owner's agent, as he may direct" — and "under the direction and supervision", are frequently construed. In all of the cases examined, some of which are cited, it is held that such phrases do not relate to the method or manner and do not govern the details or the physical means by which the work is to be performed.

that Independent Contractor shall haul and deliver to processing plants as above provided as many chickens and *at specific times and dates as ConAgra may specify*" (emphasis added). These instructions constitute specific and definite contractual directions. No employer-employee relationship was created by appellee's requirement that the loads be hauled at specific times.

■ Appellee exercised permissible control over the dates and times the poultry was to be hauled and had no control over the driving; however, appellee did exercise control over how the chickens were to be handled by PST's drivers. There is evidence showing that PST drivers could not exercise discretion in ensuring that they hauled unbruised, live birds. While the evidence supporting an employer-employee relationship is minimal, a reasonable fact finder could infer that the control factor supports a finding of employer-employee status.

*Belief in the nature of the relationship being created*

■ While appellants cite *Howard v. Dallas Morning News, Inc., supra*, for the proposition that "[t]he intent of the parties is not included among [the Restatement] factors," the *belief* that the parties are creating an employer-employee relationship is a relevant factor. *See* Restatement § 220(2)(i). The comments to Restatement § 220 state:

> *Belief as to existence of relation.* It is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other.

Restatement § 220 cmt. m. The initial agreement between the parties clearly contemplated an independent-contractor arrangement. Further, Patterson, Salter, and Garrett all testified that they never regarded the drivers to be appellee's employees. Appellants failed to present sufficient evidence to support an inference that this factor supports a finding of an employer-employee relationship.[4]

---

[4] In making their argument that PST believed it was in an employer-employee relationship, appellants cite part of Salter's deposition testimony:

### PST engaged in a distinct occupation or business

Appellee argues that PST was a separate trucking business, responsible for its own bookkeeping and insurance.[5] Appellants argues that appellee misinterpreted the meaning of this factor and notes that PST had no function other than providing poultry-hauling services to appellee. Appellee relies on *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.*, *supra*. There, our supreme court affirmed the circuit court's finding that the drivers in that case were employees. The appellant was in the business of transporting mobile homes. The drivers agreed to use their trucks

---

Q: So if they knew you didn't know how to get [to a new place] they would maybe give you some instruction on it?

A: True.

Q: If you knew a better way to get there would you take a better way?

A: No, we'd go like they told us.

This deposition testimony, however, is part of a discussion of the time sheets. Just before this cited colloquy, the following exchange occurred:

Q: It didn't tell you how to get there?

A: No.

Q: Not on the time sheet?

A: Unless they was a new place.

Q: Would that be on the time sheet?

A: Well, if they knew we didn't know it they would try to explain to us, yeah.

When looking at Sarter's entire deposition, it is clear that Sarter did not consider himself or his employees to be appellee's employees.

[5] In its brief, appellee argues:

PST was one of two trucking companies ConAgra used in north-central Arkansas. In fact, the other trucking company — Broadwater — had more trucks [than] PST and was responsible for more of ConAgra's hauling and delivery business. The trip sheets included directions for both PST drivers and Broadwater drivers. Thus, if Garrett was ConAgra's employee, then so too were Broadwater's drivers? [sic] The unreasonableness of such a conclusion is evident.

(Internal citations to the record omitted.) Appellee believes that a finding of an employer-employee relationship is absurd because of the number of truckers involved; however, it fails to show how the number of drivers would factor into the determination of whether someone was an employee or an independent contractor. It is possible that a court could find that Broadwater's drivers were indeed employees of appellee.

exclusively for the appellant's business. The circuit court found that the drivers were not engaged in a distinct occupation or business because the drivers did not engage in work other than hauling mobile homes for the appellant. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas., supra,* is similar to the instant case in that regard. PST was created for the purpose of hauling poultry for appellee. There is no evidence that PST hauled for any other company after appellee terminated the arrangement with them. A reasonable juror could infer that this evidence favors a finding that PST was not engaged in a distinct occupation or business.

### Poultry hauling as part of appellee's regular business

 Finally, appellee argues that it is in the poultry business, not the trucking business. Meanwhile, appellants argue that trucking is an integral part of appellee's business. When determining whether or not work is part of the regular business of the employer, Arkansas courts have adopted Professor Larson's "relative nature of the work test." As our supreme court explained:

> Larson reasons that in a case such as the one at bar, the law should consider, in determining whether an employer-employee status exists, not only the matter of control but also the relationship between the claimant's own occupation and the regular business of the asserted employer. With regard to the latter aspect of the problem, two considerations have weight: First, how much of a separate calling or profession is the claimant's occupation? How skilled is it? To what extent may it be expected to carry its own share of the workmen's compensation responsibility? Second, what relationship does the claimant's work bear to the regular business of the asserted employer? Is there a continuous connection or only an intermittent one, or is there no connection at all?

*Sandy v. Salter,* 260 Ark. 486, 489-90, 541 S.W.2d 929, 931 (1976) (internal citations omitted); *see also Arkansas Transit Homes, Inc. v. Aetna Life & Cas., supra.* The more that the work resembles the work done by the employer, the more likely that the work had been done by an employee. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas., supra.*

Regarding the first part of Larson's test, truck driving, while crucial to the poultry industry, is still a separate profession. Poultry companies are required to either hire employees for the purpose of

hauling poultry or contract an outside person or company to do it for them. In this case, appellee chose to contract outside companies to haul poultry. Further, the Independent Contractor Agreement required those companies to provide insurance to its drivers. Regarding the second part of the Larson test, appellee had an ongoing relationship with PST until June 2003. PST hauled poultry five days a week for appellee. Further, while appellee was not in the trucking business, appellee needed truck drivers as part of its operations. Also telling is Vanemburg's testimony that there had been no changes in the processes involved, other than the use of Pilgrim's Pride employees, trucks, and equipment, since PST ceased poultry-hauling operations. When applying Larson's test, reasonable jurors could reach different conclusions regarding the relative nature of PST's work.

## Conclusion

While many of the factors clearly support a finding that appellee and PST were engaged in an independent-contractor arrangement, there is some evidence that creates a genuine issue of fact on whether the relationship was independent contractor or an employer-employee relationship. Accordingly, we reverse the grant of summary judgment in favor of appellee and remand this case for trial.[6]

Reversed and remanded.

GLOVER and ROAF, JJ., agree.

---

[6] While we hold that there was a genuine issue of material fact that precludes summary judgment, our opinion should not be read to preclude the trier of fact from finding that an independent-contractor relationship existed between PST and appellee. Rather, we merely remand the case so that the trier of fact can weigh the evidence and reach its conclusion.